IN THE MATTER OF THE DISSOLUTION OF F YEAGER BRIDGE
AND CULVERT COMPANY

WALTER TOEBE & COMPANY v RECEIVER OF F YEAGER
BRIDGE AND CULVERT COMPANY

Docket No. 82394. Submitted January 4, 1986, at Lansing.—Decided
April 8, 1986.

On July 17, 1974, F. Yeager Bridge and Culvert Company filed a
complaint in St. Clair Circuit Court for voluntary dissolution
because of insolvency. Yeager's insolvency was caused by the
fact that the removal of federal price controls on steel products
had resulted in price increases which made it impossible for
Yeager to pay for steel that it had already contracted to supply.
On September 9, 1974, six construction companies, including
Walter Toebe & Company, all of whom had entered into con-
struction contracts with the Michigan State Highway Commis-
sion for which Yeager had subcontracted to supply fabricated
structural steel, brought an action in Ingham Circuit Court
seeking reformation of those contracts with the state on the
basis that Yeager's inability to supply the fabricated steel
because of its insolvency caused the performance of the general
contractors to become impossible in light of the then current
economic conditions. In October, 1974, the Ingham Circuit
Court granted reformation of the prime contracts by deleting
all language concerning the furnishing of fabricated structural
steel and placing the burden of furnishing such steel on the
state. In December, 1974, these six contractors filed claims
totalling $1,554,138 with the receiver, seeking compensation for

REFERENCES

Am Jur 2d, Contracts §§ 294, 297, 365, 425-430, 444, 447.

Am Jur 2d, Equity §§ 152-176.

Am Jur 2d, Estoppel and Waiver §§ 26 et seq.

Am Jur 2d, Novation §§ 4, 10.

Contractor's equitable lien upon percentage of funds withheld by
contractee or lendor. 54 ALR3d 848.

Breach or repudiation of contract as affecting right to enforce
arbitration clause therein. 32 ALR3d 377.

See also the annotations in the ALR3d/4th Quick Index under
Contracts; Novation.

damages due to delay and lost profits caused by Yeager's breach of its contracts to supply fabricated structural steel. Walter Toebe & Company filed a proof of claim in the amount of $857,255.07 for damages incurred in the period from January 1, 1974, to December 31, 1975. The receiver filed an objection to the claim, alleging that Toebe had sustained no damages, and filed a counterclaim against Toebe for $20,199.75 for work completed by Yeager under three of the nine contracts with Toebe that were at issue. The receiver raised as affirmative defenses that: (1) the damage claims were barred by the prior Ingham County judgment; (2) each of the claimants was equitably estopped from pursuing these claims; and (3) the Ingham County action against the state acted as an election of remedies. The receiver moved for summary judgment with respect to the Toebe claims. The trial court, Halford I. Streeter, J., granted the motion. Toebe appealed. The Court of Appeals peremptorily reversed the order granting summary judgment. Docket No. 77-02321, order of December 22, 1977. On remand, following a bench trial before James T. Corden, J., Toebe was awarded $90,292.75 on its claims and the receiver was awarded $20,199.72 on the counterclaims. Following modification of certain of the amounts awarded Toebe, the trial court entered a judgment in favor of Toebe in the amount of $87,888.40. The receiver appealed. *Held:*

1. Walter Toebe & Company was not equitably estopped from pursuing the claim against the assets of F. Yeager Bridge and Culvert Company by reason of the fact of its prior action for reformation of its principal contract with the state, since the nature of the action against the state was to mitigate damages, while the claim against the Yeager assets is for damages due to delays and lost profits resulting from the Yeager breach of contract.

2. Since the seeking of a reformation of the principal contract with the state was not inconsistent with the pursuing of the claim for damages against the Yeager assets, and indeed the former action had the effect of mitigating the damages sought in the later claims against the assets, the bringing of the prior reformation action did not constitute an election of remedies such as would preclude the pursuing of the claim against the assets.

3. The trial court did not abuse its discretion by refusing to permit the receiver to amend his pleadings to include a new affirmative defense to Toebe's claim. The trial court's conclusion that the bringing of the motion to amend after trial had started and some eight years after the original pleadings had

been filed was barred by the doctrine of laches is not clearly erroneous.

4. The trial court properly admitted evidence as to losses suffered by Toebe in 1976 even though the original claim filed by Toebe related only to its losses which occurred in 1974 and 1975.

5. The trial court erred in finding that the increased costs for reinforcing steel bars for the Carlo project were caused by Yeager's breach. No award should have been made on the Carlo project claim.

6. The trial court erred in awarding Toebe $7,761.64 for increased material costs on the Edison-Forsberg project, since it is clear that Toebe abandoned that claim before trial. Likewise, it clearly erred by awarding Toebe $10,000 for traffic maintenance on that project, since Toebe failed to show with reasonable certainty that any traffic maintenance costs were attributable to Yeager's breach of contract.

7. The trial court erred in making an award in favor of Toebe for increased costs of material on the Schoolcraft project, since Toebe failed to show that the increased material costs were attributable to delays caused by Yeager's breach of contract.

8. The Michigan Avenue project award was clearly not supported by the evidence to the extent that it included amounts attributable to increased concrete costs, since those costs cannot be said to be attributable to any delay caused by Yeager's breach of contract.

9. It was clear error to make the award for increased costs on the Sibley project, since it is clear that prior to Yeager's declaration of insolvency and prior to Yeager's scheduled date of performance a substitution of the designated supplier of structural steel for that project was made at Toebe's request. That substitution constituted a novation of the Yeager contract for that project and released Yeager from all further liability on that contract.

10. The trial court's award in favor of Toebe is reduced to $23,915.10.

Affirmed in part and reversed in part.

1. ESTOPPEL — EQUITABLE ESTOPPEL.
   Equitable estoppel rests on broad principles of justice.

2. ESTOPPEL — EQUITABLE ESTOPPEL.
   Equitable estoppel arises where: (1) a party, by representation, admissions, or silence, intentionally or negligently induces another party to believe facts; (2) the other party justifiably

relies and acts on this belief, and (3) the other party will be prejudiced if the first party is permitted to deny the existence of facts.

3. Estoppel — Equitable Estoppel.

Equitable estoppel may be invoked to preclude a party who has successfully maintained one position in a prior lawsuit from taking an inconsistent position in a subsequent lawsuit involving the same factual issues.

4. Contracts — Breach of Contract — Mitigation of Damages.

A breach of contract imposes on the nonbreaching party the duty to mitigate damages.

5. Election of Remedies — Application.

The doctrine of election of remedies precludes a person who chooses one of two or more inconsistent remedies from later pursuing any of the remaining remedies so as to prevent double recovery for a single injury and not to prevent recourse to alternate remedies; to apply, it is necessary that two or more inconsistent remedies exist and that one of the remedies has been pursued by the plaintiff.

6. Election of Remedies — Contracts — Breach of Contract — Mitigation of Damages.

The bringing by a principal contractor of an action for reformation of a principal contract on the basis that a breach of contract by a subcontractor has rendered performance by the principal contractor on the principal contract economically impossible does not act as an election of remedies such as will preclude the bringing of an action for damages against the subcontractor, since under those circumstances the action on the principal contract was in furtherance of the principal contractor's obligation to mitigate damages and thus was not inconsistent with the bringing of the action for damages for the breach of contract by the subcontractor.

7. Pretrial Procedure — Pleading — Amendment of Pleadings.

Leave to amend pleadings shall be freely given when justice requires; the decision to grant or deny leave to amend pleadings is addressed to the discretion of the trial court and that decision will not be reversed absent a showing of abuse of discretion; such discretion, however, is not unlimited and a motion to amend ordinarily should be granted and should be denied only for specific reasons such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, or

undue prejudice to the opposing party (GCR 1963, 118.1, now MCR 2.118[A]).

8. Equity — Defenses — Laches.

The determination of whether a party is guilty of laches depends on the particular facts in each case.

9. Equity — Defenses — Laches — Due Diligence.

Laches is concerned mainly with the question of the inequity of permitting a claim to be enforced and depends on whether the plaintiff has been wanting in due diligence.

10. Appeal — Findings of Fact.

A trial court's findings of fact in a bench trial will not be set aside unless clearly erroneous (GCR 1963, 517.1, now MCR 2.613[c]).

11. Appeal — Findings of Fact.

An appellate court will not reverse where a party claims that the evidence does not support the trial court's findings in a bench trial unless, on the entire record, the appellate court is left with a definite and firm conviction that a mistake has been made.

12. Contracts — Delays.

It is foreseeable that reasonable delays may occur in the performance of complex, multi-party construction contracts; accordingly, any liability for damages because of a delay in the performance of such a contract arises only where the delay is unreasonable.

13. Contracts — Completion Dates.

The specification of a completion or estimated completion date in a contract does not by itself constitute an affirmative representation or warranty that a project will be completed by a certain date.

14. Contracts — Breach of Contract — Damages.

A party to a contract who is injured by another's breach of contract may recover from the latter only those damages which are the direct, natural and proximate result of the breach; the party asserting a breach of contract claim bears the burden of proving its damages with reasonable certainty.

15. Contracts — Novation.

The elements necessary to a finding of a novation are: (1) parties capable of contracting; (2) a valid obligation to be displaced; (3) the consent of all parties to the substitution based upon suffi-

cient consideration; and (4) the extinction of the old obligation and the creation of a valid new one.

*Doyle Group Attorneys, P.C.* (by *Deborah G. Adams*), for claimant.

*Joseph S. Radom, P.C.* (by *Joseph S. Radom*) and *O'Sullivan, Beauchamp, Kelly & Whipple,* for respondent.

Before: GRIBBS, P.J., and D. E. HOLBROOK, JR., and T. ROUMELL,* JJ.

T. ROUMELL, J. The receiver of the F. Yeager Bridge and Culvert Company appeals as of right from the December 17, 1984, order of the St. Clair County Circuit Court in claims by Walter Toebe & Company against the assets of the insolvent corporation. Four issues are raised, three of which are without merit. We affirm the trial court's award of damages for Projects #1 and #2. We reduce the trial court's award of damages for Project #8, and vacate the award for Projects #3, #4 & 5, #6, and #9. The receiver did not challenge the award for Project #7, thus we do not review it.

On July 17, 1974, F. Yeager Bridge and Culvert Company, a supplier of fabricated structural steel, filed a complaint in the circuit court for voluntary dissolution because of insolvency. Yeager asserted that the federal government's removal of price controls on steel in 1974 caused a substantial price increase which Yeager was unable to pay, thus resulting in insolvency. On September 9, 1974, the circuit court ordered dissolution and appointed James Goerlich as receiver. Before the dissolution proceedings were initiated, Yeager had entered into contracts with Toebe and five other construction companies to supply fabricated structural

* Circuit judge, sitting on the Court of Appeals by assignment.

steel. Each of these companies had contracted to construct various bridges and highways for the Michigan State Highway Commission. Each of the companies filed a claim against the Yeager assets. We note that proceedings on the claims of the remaining five claimants, each of which is similarly situated with respect to the material issues of this appeal, have been adjourned pending resolution of this appeal.

On September 13, 1974, the six claimants filed suit in Ingham County Circuit Court against the State of Michigan and the Michigan Department of State Highways and Transportation. The complaint alleged that Yeager was a subcontractor of the claimants and had been prequalified by the state. It further alleged that Yeager's inability to perform as a result of its insolvency caused their own performance to become impossible for practical reasons in light of the then current economic conditions. On October 22, 1974, the Ingham County Circuit Court ordered that the claimants' prime contracts with the state and their subcontracts with other prime contractors be reformed by deleting all language concerning the furnishing of fabricated structural steel. The state undertook responsibility for providing the structural steel.

In December, 1974, the six claimants filed claims with the receiver, totaling approximately $1,554,138, for damages due to delay and lost profits caused by Yeager's breach of contract. The receiver counterclaimed against four of the claimants for approximately $431,396. The proof of claim filed by Toebe was in the amount of $857,255.07 and represented Toebe's estimated damages for the period between January 1, 1974, and December 31, 1975. The receiver filed an objection dated July 10, 1975, alleging that Toebe sustained no damages. The receiver filed a counter-

claim dated July 12, 1976, seeking $20,199.75 for work completed by Yeager under three contracts with Toebe.

In 1977, Toebe filed suit against the state in the court of claims for damages based on the same facts as those presented in this case. That lawsuit was still pending when trial on the merits of this case was held.

On February 10, 1977, the receiver filed against each of the six claimants the following affirmative defenses: (1) that the damage claims were barred by the prior Ingham County Circuit Court judgment; (2) that the claims were barred by the doctrine of equitable estoppel; and (3) that the claims were barred by the doctrine of election of remedies. The receiver moved for summary judgment under GCR 1963, 117.3, and the motion was granted. Toebe appealed. This Court peremptorily reversed the order of summary judgment. Docket No. 77-02321, order of December 22, 1977.

On December 8, 1980, the circuit court ordered that the receiver's affirmative defenses be stricken because they had not been included in the receiver's responsive pleadings as required by GCR 1963, 111.3. The circuit court further gave the receiver 30 days in which to file for leave to amend the pleadings. On April 20, 1982, the receiver's motion for leave to amend was granted. The receiver subsequently moved for summary judgment against the six claimants, but that motion was denied.

Following a bench trial in July, 1983, the circuit court rendered an opinion on August 3, 1984, awarding $90,292.75 to Toebe and $20,199.72 to the receiver. The award to Toebe was later modified in a judgment of December 17, 1984, resulting in a sum of $87,888.40.

On appeal the receiver argues that Toebe is

equitably estopped from seeking damages against Yeager for breach of contract. He claims that Toebe's obligation under the prime contracts to furnish fabricated steel was excused by the reformation of the contracts between Toebe and the state as a result of the litigation in the Ingham County Circuit Court in 1974. In the 1974 lawsuit, Toebe argued that its obligation to supply fabricated structural steel to the state was excused due to commercial impossibility (*i.e.,* its inability to perform resulted from Yeager's insolvency). In the instant litigation, Toebe characterizes the 1974 litigation as an effort to mitigate damages. The receiver argues that Toebe's claim in the instant litigation necessarily assumed that Toebe's obligation to the state was valid. According to the receiver, the inconsistent positions advocated by Toebe in these lawsuits give rise to the application of the doctrine of equitable estoppel. He claims it was not necessary that Yeager show reliance upon Toebe's position in the earlier litigation in order to invoke equitable estoppel, because estoppel rests upon broad principles of justice. Here justice demands that Toebe be estopped from asserting its claim against Yeager.

Equitable estoppel rests upon broad principles of justice. *Mertz v Mertz,* 311 Mich 46; 18 NW2d 271 (1945). The doctrine of equitable estoppel has been refined to include the following elements:

" '(1) a party by representation, admissions, or silence, intentionally or negligently induces another party to believe facts; (2) the other party justifiably relies and acts on this belief; and (3) the other party will be prejudiced if the first party is permitted to deny the existence of the facts.' *Cook v Grand River Hydroelectric Power Co, Inc,* 131 Mich App 821, 828; 346 NW2d 881 (1984)." *Yahrling v Belle Lake Ass'n, Inc,* 145 Mich App 620, 627; 378 NW2d 772 (1985).

Equitable estoppel has been invoked to preclude a party who has successfully maintained one position in a lawsuit from taking an inconsistent position in a subsequent lawsuit on the same factual issues. *Burgess v Holder,* 362 Mich 53; 106 NW2d 379 (1960); *Mertz v Mertz, supra.* The assertion of inconsistent positions on factual issues in successive lawsuits may come within this doctrine, although in some circumstances collateral estoppel may be a more appropriate defense. See *Stolaruk v Dep't of Transportation,* 114 Mich App 357, 361-363; 319 NW2d 581 (1982).

We reject the receiver's argument because the doctrine of equitable estoppel has no application to the facts presented. Although Toebe was excused from its obligation to furnish fabricated structural steel, its other contractual obligations remained. In this litigation, the trial court properly held that the consequences of the litigation between Toebe and the state are relevant only to the issue of damages, since Toebe had a duty to mitigate its damages. *Lorenz Supply Co v American Standard, Inc,* 100 Mich App 600, 610-611; 300 NW2d 335 (1980), *aff'd* 419 Mich 610; 358 NW2d 845 (1984). In this case, Toebe seeks damages due to delay and lost profits caused by Yeager's breach of the subcontracts between Toebe and Yeager. The fact that Yeager's performance is related to the contracts between Toebe and the state does not bring equitable estoppel into play, because Yeager's own undisputed breach of contract caused Toebe to seek relief through reformation of its contracts with the state. Justice does not demand that the doctrine of equitable estoppel be applied to this case.

The receiver next argues that Toebe is precluded from recovering damages for breach of contract after having prevailed in its litigation with the state and having successfully reformed the con-

tracts. According to the receiver, this constitutes an election of remedies. Toebe counters that the election-of-remedies doctrine is merely an extension of equitable estoppel and has no application to the facts of this case.

The doctrine of election of remedies is a procedural rule which bars a party to whom there are available two inconsistent remedies from pursuing both. The doctrine's purpose is to prevent double redress for a single injury. The essential elements are: (1) the existence of two or more remedies; (2) an inconsistency between the remedies; and (3) a choice of one of them. *Riverview Cooperative, Inc v The First National Bank & Trust Co of Michigan,* 417 Mich 307, 313; 337 NW2d 225 (1983).

In our view the doctrine of election of remedies does not apply here. Toebe's litigation with the state and Toebe's litigation with Yeager involved separate contracts. The remedies sought by Toebe, while concurrent, are consistent. As noted above Toebe had a duty to mitigate damages and successfully discharged that duty through its litigation with the state. Its suit for damages for Yeager's breach of contract raises no inconsistency. Instead, the appropriate question which we address *infra* is whether the damage award was correctly computed.

The receiver next claims that the trial court improperly denied its motion to amend its claim of affirmative defenses. The receiver sought to amend its pleadings to include a claim of the affirmative defense of commercial impracticability. The receiver made the motion to amend three days after trial started and over eight years after the receiver had filed his objection to Toebe's claim. The trial court denied the motion on the basis of laches.

According to the receiver, he was entitled by

leave of the circuit court to file his supplemental affirmative defense. GCR 1963, 118.1, now MCR 2.118(A), provides that a party may amend a pleading once as a matter of course within certain limits and, thereafter, may amend a pleading only by leave of the court or by written consent of the adverse party. It further provides that leave shall be freely given when justice requires. The decision to grant or to deny leave is within a trial court's discretion. *Welke v Kuzilla,* 140 Mich App 658; 365 NW2d 205 (1985). This Court will not reverse that decision absent an abuse of discretion. *Harvey v Security Services, Inc,* 148 Mich App 260; 384 NW 2d 414 (1986). Ordinarily, such a motion should be granted and should be denied only for specific reasons such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party and the like. *Ben P Fyke & Sons v Gunter Co,* 390 Mich 649, 656; 213 NW2d 134 (1973).

In this case the trial court denied the receiver's motion by applying the doctrine of laches. The trial court observed that the receiver's initial position, reflected in his July 10, 1975, objection to Toebe's claim, was that Toebe did not sustain any damages from the breach of contract. The trial court then observed that if the receiver felt that his defense to the claim rested upon commercial impracticability then he should have asserted that defense in the intervening eight years.

In *Rofe v Robinson (On Second Remand),* 126 Mich App 151, 154; 336 NW2d 778 (1983), the principles related to laches were summarized:

"In determining whether a party is guilty of laches, each case must be determined on its own particular facts. *Edgewood Park Ass'n v Pernar,* 350 Mich App

204, 209; 86 NW2d 269 (1957). The doctrine of laches was explained in *In re Crawford Estate*, 115 Mich App 19, 25-26; 320 NW2d 276 (1982), as follows:

" 'Laches is an affirmative defense which depends not merely upon the lapse of time but principally on the requisite of intervening circumstances which would render inequitable any grant of relief to the dilatory plaintiff. * * * For one to successfully assert the defense of laches, it must be shown that there was a passage of time combined with some prejudice to the party asserting the defense of laches. * * * Laches is concerned mainly with the question of the inequity of permitting a claim to be enforced and depends on whether the plaintiff has been wanting in due diligence. * * *' (Citations omitted.)

"See also *Lothian v Detroit*, 414 Mich 160, 168-169; 324 NW2d 9 (1982); *City of Hancock v Hueter*, 118 Mich App 811, 817-818; 325 NW2d 591 (1982)."

The trial court could properly find that laches barred the motion. A substantial passage of time, specifically the intervening eight years, and the lack of diligence would result in prejudice to Toebe. Contrary to the receiver's argument, the facts underlying the claimed defense of commercial impracticability are not the exact same facts as those underlying Toebe's litigation with the state, *i.e.*, the prohibitive cost of steel and Toebe's inability to find a substitute subcontractor. In Toebe's litigation with the state, Toebe's claim of impossibility was ostensibly grounded upon common-law principles, under which mere changes in marketing conditions which render performance unprofitable do not justify releasing a party from its obligation to perform. *Milligan v Haggerty*, 296 Mich 62, 71; 295 NW 560 (1941). See also *Cleveland-Cliffs Iron Co v Chicago & North Western Transportation Co*, 581 F Supp 1144, 1151 (WD Mich, 1984). In contrast, Yeager's defense of commercial impracticability is based upon a broader

test found in MCL 440.2615; MSA 19.2615, in which a change in market conditions may excuse a party's performance if the unforeseen market condition alters the essential nature of the performance. See UCC § 2-615, Official Comment No. 4. Moreover, MCL 440.2615(b); MSA 19.2615(b) requires a seller to allocate deliveries among customers in a fair and reasonable manner. In this case Yeager admittedly had already surpassed its steel quota when the subcontracts were negotiated. Yeager assumed a risk that steel would be available at the approximate price quoted to Toebe.

Although a review of Toebe's prime contracts with the state and Toebe's subcontracts with Yeager suggests that they are comparable with respect to the required performance, the trial court would have had to resolve specific fact issues in the present litigation which had not been resolved in Toebe's litigation with the state. The fact issues include a determination of the business risk assumed by Yeager, a determination of whether the nonoccurrence of the price increase was a basic assumption of the subcontract, and, potentially, a determination whether Yeager had fairly allocated its available structural steel supply amongst its customers.

We conclude that the trial court properly found that the eight-year delay in the assertion of the affirmative defense would result in prejudice to Toebe. The delay would harm Toebe's ability to present evidence on these fact issues. The trial court did not abuse its discretion by applying the doctrine of laches and properly denied leave to amend the receiver's affirmative defenses.

We reject the receiver's argument that the trial court failed to act in an even-handed manner when it allowed Toebe to introduce evidence which went beyond the proof of claim which Toebe had

filed. The proof of claim, dated December 5, 1974, contained estimated damages for the years 1974 and 1975, but did not expressly state that it was an estimate. At trial, the trial court admitted evidence of 1976 damages over the receiver's objection. Although the trial court was critical of the introduction of these proofs, it permitted them because Toebe's pleadings gave adequate notice of the intended proofs. An amendment to conform the pleadings to the evidence is permitted if it would not prejudice the objecting party. GCR 1963, 118.3, now MCR 2.118(C). Because the pleadings gave adequate notice of the nature of damages sought by Toebe, no prejudice accrued to the receiver by the admission of proofs of damages into 1976.

Finally, the receiver claims that any recovery is barred by the doctrine of election of remedies and that if recovery is not completely barred then the trial court made clearly erroneous fact findings when calculating the amount of damages. Having rejected the election of remedies argument, we examine the findings on damages after a brief review of the relevant contract principles.

Fact findings rendered by a trial court will not be set aside on appeal unless clearly erroneous. GCR 1963, 517.1, now MCR 2.613(C). When a party claims that the evidence does not support the trial court's findings, an appellate court will not reverse unless, on the entire record, the appellate court is left with a firm and definite conviction that a mistake has been made. *Sweetman v State Highway Dep't,* 137 Mich App 14, 20; 357 NW2d 783 (1984).

The subcontracts between Toebe and Yeager concerned a sale of goods, *i.e.,* the sale of structural steel at a certain quantity and price, and thus come under MCL 440.2105; MSA 19.2105, and

MCL 440.2201; MSA 19.2201. The rules for incidental and consequential damages are contained in MCL 440.2715; MSA 19.2715. Those rules are supplemented by basic common-law principles described in *Walter Toebe & Co v Dep't of State Highways*, 144 Mich App 21; 373 NW2d 233 (1985), an unrelated case. Because a reasonable delay is foreseeable, liability must be grounded upon an unreasonable delay. *Walter Toebe, supra,* pp 29-31. The specification of a completion date or an estimated completion date in a contract does not alone constitute an affirmative representation or warranty that the project will be completed on time. The surrounding circumstances and the realities and expectations of the parties must be considered. *Walter Toebe, supra,* pp 31-33, citing *American Ship Building Co v United States,* 228 Ct Cl 220; 654 F2d 75 (1981). A party to a contract who is injured by another's breach may recover only those damages which are the direct, natural and proximate result of the breach. *Stewart v Rudner,* 349 Mich 459; 84 NW2d 816 (1957). The party asserting a breach of contract has the burden to prove its damages with reasonable certainty. *Walter Toebe, supra,* p 38.

Toebe demanded a total of $911,519.50 in damages, an amount which included lost profits and other items. The trial court generally disallowed the following for lack of adequate proof: (1) an 8% increase in labor costs; (2) a 10% increase in equipment costs; (3) overhead costs calculated at 11.9% of the labor, materials, and equipment cost increases; and (4) lost profits. The trial court awarded damages for cost increases of materials and several miscellaneous items.

On November 8, 1984, Toebe moved for entry of judgment in an amount of $90,962.70, less two stipulated adjustments of $1,959.30 (Carlo Project

#46) and $1,115 (Edison-Forsberg Project #47), leaving a revised award of $87,888.40. It is unclear why Toebe moved for judgment in an amount of $90,962.70, an increase of $669.95 from the damage award authorized in the trial court's August 3, 1984, opinion of $90,292.75. We find no explanation for the $669.95 discrepancy. Thus, we reduce the actual judgment by that amount, leaving the sum of $87,218.45.

The receiver challenges the fact findings on all of the projects except Project #7 (6-8 Mile Road #46). We address each project *seriatim.*

*Project #1 (Thompson, McCulley #32, Belleville)*

The trial court awarded damages of $2,010.00 for costs incurred in correcting fabrication errors in the structural steel actually supplied by Yeager for this project. The trial court relied upon the testimony of Vasile Ciofu, Toebe's accountant, and that of Richard Wells, Toebe's president. We find no clear error, and affirm the award.

*Project #2 (Middlebelt #43, Livonia)*

The trial court awarded damages of $15,342.11 caused by errors in fabrication. Although conflicting testimony concerning the existence of fabrication errors was presented, the trial court weighed the credibility of the witnesses and decided that Yeager was responsible for the fabrication errors. We are not left with a definite and firm conviction that a mistake was made, and affirm the award of $15,342.11.

*Project #3 (Carlo #46, Livonia)*

The trial court awarded damages of $6,556.98 which represented the increased cost of concrete ($1,115.00) and the increased "resteel costs"

($5,441.98). "Resteel costs" refer to the cost of reinforcing steel bars.

This award was reduced by $1,959.30 by stipulation of the parties to $4,597.68. The stipulated amount of reduction reflects an award to Toebe in an unrelated litigation which reflected the increased cost of concrete for this project. Because the trial court's award for the increased cost of concrete ($1,115.00) was substantially less than the parties' stipulated reduction ($1,959.30) for that cost, it is only the increased resteel costs which are at issue.

The purchase order authorized a $1.32/cwt ($.0132/lb) price increase for reinforcing steel bars shipped six months after the date of the project proposal. 412,271 pounds were shipped between March 20, 1974, and August 13, 1974. The August 13, 1974, shipment of 225,352 pounds was the only one charged with the price increase. Therefore, the maximum increased resteel costs supported by record evidence is $2,974.65 ($.0132/lb × 225,352).

Richard Wells, Toebe's president, testified that the state's substituted delivery of structural steel was not due until August, 1975. Yeager's delivery under its subcontract and the critical path network (CPN) was not due until November, 1974. The CPN provided the earliest and the latest dates of performance deemed acceptable by the state in which to complete the project on time. All contracts provided that time was of the essence. When a contract contained a CPN, the CPN dates were expressly incorporated into the subcontract.

Wells testified that Yeager's actual delivery date, apparently established by oral agreement, was set for late July or August, 1974. The earlier delivery date was apparently established to accommodate Toebe's interest in completing the project earlier than required in order to reap greater

profits for Toebe. In contrast, Neil Davis, Yeager's president, indicated that Yeager would not fabricate steel until October, 1974, for all its subcontracts. The vendor invoice for the August 13, 1974, resteel shipment indicates that the price increase took effect after July 18, 1974. Because the August 13, 1974, resteel shipment clearly preceded Yeager's time for performance under the CPN and because the price increase preceded Yeager's time for performance under the alleged oral agreement, the trial court clearly erred by awarding damages for delay to Toebe.

Toebe's proofs generally showed that resteel-related deliveries preceded structural steel deliveries. A significant causation question is presented by holding Yeager liable for increased resteel costs, especially when actual resteel deliveries preceded Yeager's time for performance under the CPN, because Toebe exercised full control over the timing of the placement of resteel orders. The resteel orders apparently did not depend upon receipt of the structural steel. Although a subsequent delay in delivery of structural steel would reasonably be expected to result in additional costs, such as storage, the issue is whether increased resteel costs are causally connected with Yeager's breach of contract. In contrast, delays in the delivery of concrete have a clearer causal connection, since concrete was not to be poured until after structural steel was erected.

In short, we conclude that no award of damages should have been made to Toebe for this project. We are left with a firm and definite conviction that the trial court erred.

*Combined Projects #4 & #5 (Edison-Forsberg*
*#47, Saginaw County)*

The trial court made an award of $17,761.64,

$7,761.64 of which was awarded for the increased cost of materials, and $10,000.00 of which represented traffic-maintenance costs. The parties subsequently stipulated to a reduction of $1,115.

Toebe's original claim for these combined projects was $168,904.78, which included $7,761.64 for the increased cost of materials. At trial, Toebe reduced its claim by $83,511.10, a figure which included elimination of the increased cost of materials. Toebe concedes this in its brief on appeal. Therefore, the trial court's award of $7,761.64 for the increased cost of materials is clearly erroneous.

Toebe's original claim for traffic-maintenance costs was $62,635.70. We conclude that the award is clearly erroneous from the proofs presented, and vacate the $10,000 award in its entirety.

These combined projects took place in the I-75—Cass River area. Barricades and signs were erected to direct traffic around the construction area. In the Forsberg Project, the CPN showed that structural steel was to be delivered by September, 1974. It was actually delivered through a substitute supplier in October, 1975. Richard Wells stated that the project would have been completed in November, 1974, if the structural steel had been timely delivered in August, 1974. Delivery in September, 1974, would have resulted in completion by April, 1975, according to his testimony. It is a reasonable inference from this testimony that Wells foresaw a very short time interval before winter weather conditions would interfere and delay the project. Generally, seasonal suspensions of work were anticipated. The project was completed in June, 1976. The Edison Project showed a CPN delivery date scheduled for November, 1974, but structural steel was not delivered until Au-

gust, 1975, and the job was completed in June, 1976.

Toebe's claim of $62,635.70 for traffic-maintenance costs is apparently made up of the costs for the period from January 1, 1975, to June 1, 1976, for the Edison Project in an amount of $47,072.42, and the costs for the period from June 12, 1975, to November 20, 1975, for the Forsberg Project in an amount of $15,563.28. Richard Wells testified that the winter season caused damage and delay when motor vehicles struck and damaged many flashers. Toebe's claim appears to be contradicted however by its 1976 published financial statement which showed $18,362 attributable to direct costs of traffic maintenance for the entire combined project, excluding labor. This amount included all invoiced expenses. Although the trial court noted that the proofs of traffic maintenance damages were unsatisfactory, it awarded $10,000 because some delay was evident and had occurred.

In our view Toebe has not proved its damages with reasonable certainty because no invoices showing actual rental costs, the rental periods, or the actual traffic-maintenance costs compared with the expected costs are provided in the exhibits. Toebe's accountant was unable to fully explain the discrepancy between Toebe's published financial statements and the summary of extra traffic-maintenance costs contained in the Project #5 binder under the "damages" tab. In our view, Toebe failed to demonstrate that any portion of its traffic-maintenance costs was attributable to Yeager's breach of contract. We conclude that the trial court's finding was clearly erroneous.

*Project #6 (Schoolcraft #49, Livonia)*

The trial court awarded $18,450.08, representing the increased cost of materials. This award reflects

increased costs for resteel ($12,083.83) and concrete ($6,366.25) and was made on Toebe's claim of delay damages. After reviewing the record evidence, we conclude that the claim is without merit and that the trial court clearly erred by making an award on this claim.

Twelve bridges were constructed. Delivery of structural steel was scheduled for May, 1975. Although a CPN computer printout is not included in the Project #6 binder, a flow chart shows how the project was scheduled to progress. It is unclear from the flow chart whether structural steel for all 12 bridges was deliverable in May, 1975. Actual delivery of the structural steel was made by a substitute supplier between May 13, 1975, and March 30, 1976.

The increased cost of concrete was based upon an annual estimated price increase of $1.25/cwt. Vendor invoices show that concrete deliveries occurred between July 8, 1975, and November 24, 1975. Since concrete deliveries could not have become necessary until structural steel was erected and such was scheduled for May, 1975, the trial court clearly erred by holding Yeager accountable for the cement price increase for 1975.

Resteel orders preceded structural steel deliveries. Vendor invoices show resteel shipment dates between July 18, 1974, and May 9, 1975. Since resteel delivery dates and price increases preceded Yeager's scheduled time for performance in May, 1975, Toebe's claim for delay damages is without merit.

### Project #8 (Michigan Avenue #50, Wayne County)

The trial court awarded damages of $7,945.80 for this project, $4,646.25 of which represents the increased cost of concrete and $3,299.55 of which

represents increased resteel costs. For reasons explained below, the trial court clearly erred by making an award for the increased cost of concrete, but did not clearly err by maing an award for increased resteel costs.

Six bridges were constructed. Bridges designated as "B-01", "B-05", "S-05", and "S-11" required structural steel. The CPN scheduled delivery date for bridges "S-05", and "S-11" was December 9, 1974. This late delivery date created a risk of seasonal suspension of work. Bridges "B-01" and "B-05" had an August 30, 1974, delivery date. Deliveries of structural steel were actually made by a substitute supplier between October 17, 1975, and January 20, 1976. The project was completed on April 22, 1976. Vendor invoices show that concrete deliveries occurred in 1975. Bridge "B-01" was the only bridge which was scheduled for an early start date for deck work in April, 1974. Presumably, deck work refers to pouring cement after the erection of structural steel. The earliest "finish" scheduled date for bridge "B-01" was May 6, 1975. Bridges "S-05", "S-11", and "B-05" had deck work scheduled entirely in 1975. Since 1975 was the year in which the cement would have become necessary in the normal course of the project, the trial court clearly erred in finding Yeager liable for price increases occurring between 1974 and 1975. Whether Toebe could have completed the project earlier, and thereby could have made additional profit through cost-savings, is too speculative to be attributable to Yeager's breach of contract.

Resteel shipments occurred in April and May, 1975, and were subject to the $1.25/cwt price increase which became effective January 1, 1975. Although Toebe's need for the reinforcing steel bars apparently preceded its need for structural

steel as we have noted in our discussion under the analysis of Project #3, we are not left with a firm and definite conviction that the trial court clearly erred by awarding damages for delays which resulted in increases in resteel costs. This is because resteel shipments were actually delayed until after Yeager's scheduled time for performance in 1974.

### Project #9 (Sibley #51, Wayne County)

The trial court awarded $18,962.70, representing the increased cost of materials. Specifically, the increased cost of concrete was $4,753.75 and the increased cost of resteel was $14,208.95. We find that the trial court clearly erred by making this award, because a substitution of another supplier, Apollo, for Yeager constituted a novation which released Yeager from liability.

In April, 1974, Toebe asked Yeager if Yeager would agree to give the Sibley job to Apollo. Yeager consented to the substitution. Yeager's performance under the CPN had been scheduled for December, 1974. Structural steel was delivered in March and April, 1975, primarily by Apollo. The project was completed in September, 1975, which was within the CPN. The trial court premised its damage award upon testimony that a June, 1975, completion date would have been possible if delivery had been timely. The trial court characterized the substitution of Apollo as an effort by Toebe to mitigate damages.

The trial court's characterization is clearly erroneous. The substitution of Apollo was agreed upon before Yeager declared in June, 1974, that it would be unable to fulfill the subcontracts. In April, 1974, there was no basis on which to justify Toebe's insecurity concerning Yeager's ability to perform. Toebe was merely trying to fix an acceptable delivery date for the structural steel.

A novation requires: (1) parties capable of contracting; (2) a valid obligation to be displaced; (3) consent of all parties to the substitution based upon sufficient consideration; and (4) the extinction of the old obligation and the creation of a valid new one. *Macklin v Brown,* 111 Mich App 110, 112; 314 NW2d 538 (1981). The parties' consent does not have to be in writing, but may be implied from the facts and circumstances of the transaction. *Keppen v Rice,* 257 Mich 299; 241 NW 156 (1932). The elements of a novation are met by the facts and circumstances of this case. The record provides evidence that all parties consented to the substitution of Apollo for Yeager. Sufficient consideration was furnished by the parties' mutual agreement to discharge Yeager from its obligation to perform and to substitute Apollo in order to provide Toebe with a fixed delivery date. Early delivery dates were critical to Toebe's profit objectives, even though they were not essential to the completion of Toebe's contract with the state. From these facts and circumstances, we may reasonably infer that Yeager's obligation was extinguished and replaced by an obligation to perform owed by Apollo.

Even if a novation was not effectuated, the trial court clearly erred by holding Yeager liable for the increased cost of concrete between 1974 and 1975. Cement deliveries took place between June 2, 1975, and November 21, 1975. Cement is poured after structural steel is erected. Because Toebe and Yeager never agreed upon a separate delivery date and the CPN did not require structural steel delivery until December, 1974, it is reasonable to conclude that no cement would have been required until 1975. The CPN indicated that all "deck" work was scheduled for 1975. In light of this time frame, we conclude that the award for the in-

creased cost of concrete between 1974 and 1975 was clearly erroneous.

We would also find that the award of $14,208.95 for increased resteel costs was clearly erroneous. Resteel shipments occurred between July 24, 1974, and November 21, 1974, and again between January 10, 1975, and March 3, 1975. This preceded Apollo's actual delivery of structural steel. At most, it would be appropriate to hold Yeager liable for the 1975 resteel price increase of $1.25/cwt effective with the January 1, 1975, shipments. According to the invoices, a total of 792,515 pounds of steel was shipped between January 15, 1975, and March 3, 1975. Accordingly, approximately $9,906 in damages for increased resteel costs would be appropriate if a novation had not been effectuated. However, we find that a novation occurred, and no damages are appropriate for this project.

### *Summary of Damages*

The following table presents an overview of the damages awarded by the trial court and of the revisions described in this opinion.

| Project Binder No. | Project Title & Number | Actual Award | Revised Award By Court of Appeals |
|---|---|---|---|
| 1 | Thompson, McCulley #32 (Belleville) | $ 2,010.00 | $ 2,010.00 |
| 2 | Middlebelt #43 (Livonia) | $15,342.11 | $15,342.11 |
| 3 | Carlo #46 (Livonia) | $ 4,597.68(1) | $ 0 |
| 4 & 5 | Edison-Forsberg #47 (Saginaw) | $16,646.64(1) | $ 0 |
| 6 | Schoolcraft #49 (Livonia) | $18,450.08 | $ 0 |
| 7 | 6-8 Mile Road #46 (Livonia) | $ 3,263.44 | $ 3,263.44 |

| 8 | Michigan Avenue #50 (Wayne County) | $ 7,945.80 | $ 3,299.55 |
| 9 | Sibley #51 (Huron and Romulus Twps) | $18,962.70 | $    0 |
| | TOTAL | $87,218.45 | $23,915.10 |
| | Unexplained Increase | $    669.95 | |
| Damage award per Order of 12/17/84 | | $87,888.40 | |

(1) Includes the $1,959.30 stipulated reduction for Project 3 and the $1,115 stipulated reduction for combined Projects 4 & 5.

The judgment of the trial court is affirmed in part and reversed in part. The damages provisions for Project Nos. 3, 4 & 5, 6, 8, and 9 are reduced in an amount described by this opinion. No costs allowed, neither side having prevailed in full.