Brassard, J.
Plaintiff Thermo Electron Corporation (“Thermo”) brought this action to enforce a guarantee (the “Guarantee”) executed by the defendant Waste Management Holdings, Inc. (“WMH”). This matter is before the Court on the parties’ cross motions for summary judgment. For the reasons set forth below, Thermo’s motion for summary judgment is ALLOWED.
I. BACKGROUND
Pursuant to the summary judgment record, the undisputed material facts are as follows.
On December 22, 1994, Thermo and Rust International Corporation (“Rust”) entered into an Engineering, Procurement and Construction Agreement (“EPC Agreement”) concerning the construction of a de-inking pulp facility in Menominee, Michigan (the “Project”).[1] At the time the EPC Agreement was entered into, Rust was a majority-owned subsidiary of WMH.[2] The EPC Agreement was essentially a subcontract under which Thermo, as the general contractor on the Project, subcontracted to Rust the vast majority of the engineering, procurement and construction responsibilities relating to the Project. Pursuant to Article 10.3 of the EPC Agreement, Rust warranted to Thermo that “the design and engineering of the Project shall be performed in accordance with the standard of care, skill, and diligence as would be provided by an engineering firm experienced in supplying similar services nationally to pulp and paper producing entities.”
As a condition of its entering into the EPC Agreement with Rust, Thermo insisted that WMH execute a guarantee, the terms of which provide, in relevant part:
The Guarantor [WMH] for valuable consideration, the receipt and adequacy of which are hereby acknowledged, hereby unconditionally and irrevocably guarantees to Thermo the full, faithful and punctual payment, and not merely collection, when due, whether by acceleration or otherwise, of all sums (including all interest) which hereafter become due from Rust to Thermo under and pursuant to the [EPC] Agreement.
Guarantee at par. 3(a). The only defenses available to WMH under the Guarantee were those defenses “available to Rust and [which] have not been limited by the express provisions of the [EPC] Agreement and which have not been waived pursuant to Section 6 or 8 below.” Guarantee at par. 4. One such defense waived by WMH pursuant to Paragraph 6 of the Guarantee is *713 the defense of “notice of any default or termination given by Thermo to Rust under the [EPC] Agreement.” Guarantee at par. 6(vii). The Guarantee also provides that “[t]he Guarantor’s liability hereunder shall be unaffected by . . . any change in the corporate existence, structure or ownership of Rust.” Guarantee at par. 9(v).
Under Article 24 of the EPC Agreement, Rust was required to make certain payments to WMH in consideration for WMH providing the Guarantee. Thermo was to “reimburse” Rust for these payments in the amount of $250,000 for each year that the Guarantee remained in effect. EPC Agreement at Article 24. Attorney Robert Craig of WMH testified in his deposition that he could not find any evidence to suggest that Rust had made payments to WMH, as required by Article 24 of the EPC Agreement. Thermo has not made any reimbursement payments to Rust. Rust has never sent Thermo a bill, invoice or other request for reimbursement pursuant to Article 24, nor has Rust ever sent a written notice to Thermo notifying it of its failure to pay any amount required under Article 24.
On May 20, 1996, pursuant to an Asset Purchase Agreement (“APA”), Rust sold certain of its assets and assigned certain of its contracts, including the EPC Agreement, to Raytheon Engineers & Constructors, Inc. (“Raytheon”). The APA provides, in relevant part:
The Buyer [Raytheon] agrees to use commercially reasonable efforts . . . including] the provision of substitute security of like character, quality and amount, to obtain the release of the Sellers, Rust, WMX and their Affiliates from those Support Agreements indicated as ‘To Be Released” on Schedule 8.7. [Raytheon] will consult with Rust from time to time concerning the progress made with respect to any such releases, and will permit Rust reasonable participation in such process.
APA at par. 8.7. The Guarantee executed by WMH for Rust’s work on the Project is included among the “Support Agreements” referenced in Schedule 8.7 of the APA.
In November of 1996, a major component of the waste water treatment plant at the de-inkmg pulp facility failed. In early 1997, Thermo and Raytheon entered into a funding agreement to address the failure of the waste water treatment plant. The funding agreement provided that the parties would share the costs of investigation and repair, and that once the problem was addressed, Thermo and Raytheon would enter into binding arbitration to apportion liability.
On January 31, 2000, Thermo, Raytheon, and a third party commenced an arbitration proceeding to determine liability and to apportion damages for the failure of the waste water treatment plant.[3] Several former Rust employees served as key witnesses over the course of the 34-day arbitration proceeding. In a written decision dated November 29, 2000, the panel of arbitrators determined that Rust had breached its design warranty to Thermo under the EPC Agreement. The panel found that mechanical completion of the Project had occurred on July 19, 1996, and that Rust’s breach of the design warranty had occurred prior to this time. Raytheon, as the successor to Rust, was ordered to pay damages to Thermo in the amount of $3,823,545. On February 15, 2001, Raytheon paid Thermo $2,567,757 of the arbitration award, leaving an outstanding balance of $1,255,788. On September 28, 2001, the United States District Court for the District of Massachusetts (Harrington, J.) issued an order confirming the arbitration award plus postjudgment interest, for a total unpaid balance of $1,364,370.18.
In May of 2001, Raytheon, which prior to that time had been acquired by Washington Group International, Inc. (“WGI”), became subject to a bankruptcy proceeding when WGI filed for bankruptcy protection in the Federal Bankruptcy Court for the District of Nevada. On June 8, 2001, Thermo made demand on WMH to pay the outstanding balance of the arbitration award, pursuant to the Guarantee executed by WMH. On July 18, 2001, Thermo filed the present action, seeking to enforce the Guarantee. On October 17, 2002, Rust and WMH entered into an “Assignment of Rights and Claims,” pursuant to which Rust assigned its right to collect any Guarantee payments due to Rust under Article 24 of the EPC Agreement. On November 26, 2002, WMH filed a motion to amend its answer to include a counterclaim for breach of contract against Thermo, due to Thermo’s alleged failure to make payments to Rust under Article 24 of the EPC Agreement.
II. DISCUSSION
A. Legal Standard for Summary Judgment
Summary judgment is appropriate where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 643-44 (2002), citing Kourouvacilis v. General Motors Corp., 410 Mass. 706, 711 (1991); see also Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of material fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the non-moving party’s case, or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis, 410 Mass. at 716. When the non-moving party bears the burden of proof on an issue for which summary judgment is sought, that party must oppose the motion with admissible evidence on the issue in order to defeat the summary judgment motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). *714 When presented with a motion for summary judgment, the court must consider the evidence in the light most favorable to the non-moving party. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995).
B. Enforceability of the Guarantee Against WMH
WMH argues that it has no liability under the Guarantee for the following reasons:[4] (1) Thermo’s claims against Rust are barred by the statute of limitations: (2) Rust was not a party to the arbitration proceedings, and therefore it is not bound by the arbitrator’s findings; (3) the assignment of the EPC Agreement from Rust to Raytheon extinguishes WMH’s obligations under the Guarantee; and (4) WMH’s responsibilities under the Guarantee were discharged by a novation of the EPC Agreement because Thermo impliedly consented to the assignment of the EPC Agreement from Rust to Raytheon. Pursuant to the choice of law provisions contained in the agreements at issue in this case, this Court shall interpret the EPC Agreement under Michigan law, and the Guarantee under Illinois law.
(1) Statute of Limitations
Paragraph 3(a) of the Guarantee provides that WMH is obligated to pay “all sums which hereafter become due from Rust to Thermo under and pursuant to the [EPC] Agreement.” WMH argues that no amount is due from Rust to Thermo, because any potential claim against Rust is time-barred. Specifically, under Article 10.7 of the EPC Agreement, Rust made no warranties with respect to any breach not reported to it within thirty days after the expiration of the design warranty period. According to WMH, the design warranty period ended no later than January 19, 1997, and therefore in order to make a claim against Rust, Thermo had to report the breach to Rust within thirty days of this date.
WMH’s argument is premised on the notion that Rust cannot be liable to Thermo for breach of the design warranty because Thermo failed to report Rust’s breach within thirty days of January 19, 1997.[5] However, Rust’s liability for breach of the design warranty has already been conclusively established by the arbitration award entered in favor of Thermo on November 29,2000. Raytheon, as Rust’s successor in the arbitration proceeding, had every incentive to raise any and all defenses available to Rust under the EPC Agreement.[6] After hearing thirty-four days of testimony, the panel of arbitrators determined that Rust had breached the design warranty contained in the EPC Agreement, and it ordered Raytheon to pay Thermo $3,823,545.
The terms of the Guarantee provide that WMH “unconditionally and irrevocably guarantees to Thermo the full, faithful and punctual payment... of all sums which hereafter become due from Rust to Thermo under and pursuant to the [EPC] Agreement.” Guarantee at par. 3(a). WMH has not provided this Court with any evidence that the decision rendered by the panel of arbitrators, and confirmed by the United States District Court for the District of Massachusetts (Harrington, J.), is deficient in any respect. WMH’s obligations under the Guarantee are clear; they do not contemplate the relitigation of defenses that could have been raised by Rust/Raytheon in the previous arbitration hearing.
Moreover, the only defenses available to WMH under the Guarantee were those defenses “available to Rust and [which] have not been limited by the express provisions of the [EPC] Agreement and which have not been waived pursuant to Section 6 or 8 below.” Guarantee at par. 4. One such defense waived by WMH pursuant to Paragraph 6 of the Guarantee is the defense of “notice of any default or termination given by Thermo to Rust under the [EPC] Agreement.” Guarantee at par. 6(vii). At the time it executed the Guarantee, WMH waived the veiy defense that it now seeks to assert. Therefore, WMH cannot be released from liability under the Guarantee for any alleged failure on the part of Thermo to provide notice of breach of the design warranty to Rust.
(2) Failure to Include Rust as a Party to the Arbitration
WMH contends that it cannot be held liable under the Guarantee based on Thermo’s failure to include Rust as a party to the arbitration. WMH’s position is untenable for two reasons. First, the Guarantee is replete with provisions stating that WMH’s liability is not conditioned on Thermo’s initiating an action against Rust. Guarantee at par. 5 (“Thermo may bring a separate action against [WMH] without first proceeding against Rust.”); see also Guarantee at pars. 6, 9, 11, 12.
Second, Rust would be precluded from relitigating the issue of its liability under the EPC Agreement pursuant to the doctrine of collateral estoppel, which requires that (1) there was a final judgment on the merits in the prior adjudication; (2) the party against whom preclusion is asserted was a party (or in privity with a party) to the prior adjudication; and (3) the issue in the prior adjudication was identical to the issue in the current adjudication. Tuper v. North Adams Ambulance Serv., Inc., 428 Mass. 132, 134 (1998). “A non-party to a prior adjudication can be bound by it ‘only where [the nonparty’s] interest was represented by a party to the prior litigation.’ ” TLT Constr. Corp. v. A. Anthony Tappe & Assocs., Inc., 48 Mass.App.Ct. 1, 5-6 (1999), quoting Massachusetts Prop. Ins. Underwriting Ass’n v. Norrington, 395 Mass. 751, 754 (1985). As noted previously, it is evident that Raytheon, as successor to Rust and as the entity held financially accountable for Rust’s breach of the design warranty, had every incentive to represent Rust’s interests at the arbitration proceeding. In this case, as in TLT Constr. Corp., 48 Mass.App.Ct. at 6, there was no reason for Rust to be included in the arbitration because Ray *715 theon was liable for Rust’s actions. Therefore, WMH cannot be released from liability under the Guarantee for Thermo’s failure to include Rust as a party to the arbitration.[7]
(3) The Rust/Raytheon Assignment
WMH argues that no amount has “become due from Rust to Thermo” so as to trigger WMH’s obligation under the Guarantee, because Rust assigned its rights and obligations under the EPC Agreement to Raytheon on May 20, 1996. Under Illinois law, “a guaranty is to be strictly construed in favor of the guarantor such that the guarantor is accorded the benefit of any doubt that arises from the contract language.” T.C.T. Bldg. Partnership v. Tandy Corp., 323 Ill. App.3d 114, 118-19 (2001) (internal citation omitted). WMH argues that, because the terms of the Guarantee are limited to the obligations of Rust, WMH’s liability under the Guarantee does not extend to the obligations of Raytheon.
WMH’s argument is flawed in two respects. First, “[a] guaranty is a contract and should be interpreted according to the standards that govern the interpretation of contracts in general." T.C.T. Bldg. Partnership, 323 Ill.App.3d at 118. It is a well settled principle of contract law that a party may not unilaterally assign away its obligations under a contract. United States for Use of Valders Stone & Marble, Inc. v. C-Way Constr. Co., 909 F.2d 259, 266 (7th Cir. 1990) (“Unless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor or the person delegated discharges any duty or liability of the delegating obligor”), quoting Restatement (2d) of Contracts, §318(3) (1981); see also 4 Corbin on Contracts §866 (1951) (“The performance required by a duty can often be delegated; but by such a delegation the duty itself is not escaped”).
Furthermore, under Illinois law a guarantee is enforceable after a change in ownership of the underlying obligor, so long as there is no material change in the guaranteed obligation. Essex Int’l, Inc. v. Clamage, 440 F.2d 547, 550 (7th Cir. 1971) (applying Illinois law) (“Unless there is some material change in the business dealings between the debtor and the creditor-guarantee and some increase in the risk undertaken by the guarantor, the obligation of the guarantor is not discharged”). “Whether a guarantor is exposed to an increase in the risk it originally undertook is a key variable in determining whether there has been a material change in the guaranty agreement.” Roels v. Drew Indus., Inc., 240 Ill.App.3d 578, 583 (1992) (internal citations omitted).
In this case, the assignment of the EPC Agreement from Rust to Raytheon pursuant to the APA neither increased nor materially altered the risk of WMH. WMH guaranteed to pay to Thermo “all losses, costs, expenses and damages for which Rust becomes liable to Thermo as a result of breach by Rust of the [EPC] Agreement.” Guarantee at par. 3(a). The panel of arbitrators determined that Rust’s breach of the design warranty occurred prior to July 19, 1996, the date of mechanical completion of the Project. Rust and Raytheon entered into the APA on May 20, 1996. The evidentiary record in this case indicates that Rust performed most, if not all, of the work that became the subject of the underlying arbitration. The amount awarded to Thermo by the panel of arbitrators was for breach of the design warranty contained in the EPC Agreement, the exact same liability that WMH undertook to guarantee. Stated otherwise, “the sums due plaintiff were within the scope of defendant’s reasonably anticipated liability under the guaranty.” Roels, 240 Ill.App.3d at 583.
Additionally, Paragraph 8.7 of the APA demonstrates that WMH, Rust, and Raytheon all assumed that WMH’s liability under the Guarantee remained unchanged by the APA:
The Buyer [Raytheon] agrees to use commercially reasonable efforts . . . including] the provision of substitute security of like character, quality and amount, to obtain the release of the Sellers, Rust, WMX and their Affiliates from those Support Agreements indicated as “To Be Released” on Schedule 8.7. [Raytheon] will consult with Rust from time to time concerning the progress made with respect to any such releases, and will permit Rust reasonable participation in such process.
APA at par. 8.7. The Guarantee executed by WMH for Rust’s work on the Project is included among the “Support Agreements” referenced in Schedule 8.7 of the APA. The fact that Raytheon never obtained the release mentioned in Paragraph 8.7 further supports this Court’s conclusion that the APA did not extinguish WMH’s liability under the Guarantee.
(4) Novation
WMH’s final argument is that Thermo entered into a novation of the EPC Agreement with Rust by consenting to the substitution of Raytheon for Rust. According to WMH, this novation of the EPC Agreement releases it from any liability under the Guarantee. Under Michigan law, a novation requires: (1) parties capable of contracting; (2) a valid obligation to be displaced; (3) consent of all parties to the substitution based upon sufficient consideration; and (4) the extinction of the old obligation and the creation of a valid new one. In re Yeager Bridge Co., 150 Mich.App. 386, 410 (1986).
In each of the cases relied upon by WMH, there was some overt act of acceptance on the part of the plaintiff. In re Yeager Bridge Co., 150 Mich.App. at 409 (holding that a novation had occurred where the plaintiff contractor asked one steel supplier to give a particular job to another steel supplier); Oakland County v. Allen, 295 Mich. 61, 66-68 (1940) (finding that plaintiff depositor’s surrender of its certificates of deposit from a liquidated bank to a second bank, as *716 well as plaintiffs acceptance of dividends from the second bank more than six years after that bank had assumed the liabilities of the liquidated bank established a novation).
The evidence submitted by WMH is insufficient to establish Thermo’s consent to the substitution of Raytheon for Rust. WMH cannot parlay Thermo’s failure to institute an action for breach of contract against Rust for the assignment of the EPC Agreement into an overt act of acceptance and consequent novation on Thermo’s part. Moreover, while Article 16.1 of the EPC grants Thermo the right to reject the assignment of the EPC Agreement, Paragraph 9(iii) of the Guaranty provides that WMH’s liability as Guarantor would remain “unaffected by... any exercise, non-exercise or waiver by Thermo of any right, power, remedy or privilege, under or in respect of the [EPC] Agreement, this Guarantee, any such other instrument, or at law or in equity.”
Likwise, Thermo’s decision to enter into a funding agreement with Raytheon to address the problems that had arisen on the Project, and its subsequent acceptance of funds from Raytheon pursuant to this agreement, does not establish a novation. Under Michigan law, “[p]ayment on a debt by a third party which is accepted by a creditor does not establish a novation.” Macklin v. Brown, 111 Mich. App. 110, 113 (1982). Therefore, since WMH has failed to submit sufficient evidence to establish that Thermo consented to the substitution, under the EPC Agreement, of Raytheon for Rust, WMH cannot be released from liability under the Guarantee on the grounds of novation.
C. WMH’s Proposed Counterclaim for Breach of Contract
WMH has filed a motion to amend its answer to include a counterclaim for breach of contract against Thermo, due to Thermo’s alleged failure to make payments to Rust under Article 24 of the EPC Agreement. Under Article 24, Rust was required to make certain payments to WMH in consideration for WMH providing the Guarantee. Thermo was to “reimburse” Rust for these payments in the amount of $250,000 for each year that the Guarantee remained in effect. EPC Agreement at Article 24.
The plain language of Article 24 conclusively demonstrates that Thermo’s obligation to make “reimbursement” payments to Rust only arose after Rust made payments to its parent, WMH. Rust’s obligation to make payments to WMH was therefore a condition precedent to Thermo’s reimbursement obligation. MacDonald v. Perry, 342 Mich. 578, 586 (1955) (“A condition precedent is a fact or event which the parties intend to exist or take place before there is a right to performance”). As the party seeking to enforce a contractual right dependant on the satisfaction of a condition precedent, WMH bears the burden of establishing that the condition was satisfied. Valley National Bank v. Kline, 108 Mich.App. 133, 138 (1981).
WMH has not submitted any evidence to show that Rust ever made payments to WMH pursuant to Article 24. Attorney Robert Craig of WMH testified in his deposition that he could not find any evidence to suggest that Rust had made payments to WMH. Since the undisputed facts in this case establish that WMH would not be able to carry its burden on its proposed counterclaim for breach of contract, any such counterclaim would be futile. Accordingly, this Court denies WMH’s motion to amend its answer to assert a counterclaim for breach of contract.[8]
ORDER
1) It is hereby ORDERED that plaintiffs motion for summary judgment is ALLOWED.
2) It is hereby ORDERED that defendant’s motion for summary judgment is DENIED.
3) It is hereby ORDERED that defendant’s motion to amend its answer to assert a counterclaim for breach of contract is DENIED.

There is evidence that the EPC Agreement was not actually signed until February 28, 1995, although it was dated as of December 22, 1994. The precise date that the EPC was entered into is immaterial for purposes of resolving the cross motions for summary judgment.

WMH was then known as WMX Technologies, Inc.

WMH initially disputed the issue of whether or not Rust had knowledge of this arbitration proceeding. However, in a supplemental filing with the Court, WMH now concedes that Rust did have knowledge of the arbitration proceeding, by virtue of a subpoena issued to Rust during the discovery phase of the arbitration.

WMH has withdrawn its defense of lack of personal jurisdiction, because it has availed itself of this Court’s jurisdiction by filing a motion to amend its answer to assert a counterclaim for breach of contract. (WMH’s Summary Judgment Memorandum at pp. 1-2, n.2.)

Thermo asserts that it did give notice to Rust by sending a letter to Rust’s Project Manager, as well as to Rust’s general counsel, providing notice of Rust’s “breach of the general and design warranties.” A copy of this letter, dated December 26, 1996, is included in the record, but there is no evidence that the letter was ever delivered to or received by Rust/Raytheon. In order to establish that it provided the requisite notice under Article 23.7 of the EPC Agreement, Thermo must submit some tangible evidence to demonstrate that it at least attempted to deliver this letter to Rust. See EPC Agreement at Article 23.7.1. However, for the reasons stated infra, Thermo’s failure to provide evidence of delivery is immaterial for purposes of resolving the cross motions for summary judgment.

In its pre-hearing memorandum filed with the panel of arbitrators, Raytheon states: “In June 1996, Raytheon Engineers & Constructors, Inc. purchased most assets of Rust, including all contracts associated with the GLP&F Project. Accordingly, Raytheon is the successor in interest to Rust... and the term ‘Raytheon’ as used herein encompasses Rust . . . and Raytheon, as applicable.” (Raytheon Pre-Hearing Memorandum at p. 2, n. 1.)

WMH argues, citing Williams v. Logan, 184 Mich.App. 472, 478 (1990), that Rust was not in privity with Raytheon because under Michigan law “[a] privy is one who, after rendition of the judgment, has acquired an interest in the subject matter affected by the judgment through or under one *717 of the parties, as by inheritance, succession, or purchase.” (Emphasis added.) To the extent that there may be some differences between Massachusetts law and Michigan law as it relates to the offensive use of collateral estoppel, this Court concludes that under the circumstances of this case, the application of collateral estoppel would in no way lead to an unjust result. Given Raytheon’s strong incentive to represent Rust’s interests at the arbitration, Rust’s actual knowledge of the arbitration, as well as the fact that several former Rust employees served as key witnesses during the arbitration proceeding, allowing WMH to shed its “unconditional and irrevocable” obligation under the Guarantee because of Thermo’s failure to name Rust as a party to the arbitration would result in an inequitable exaltation of form over substance.

Since WMH’s proposed counterclaim would be futile, this Court need not reach the issue of whether Rust’s assignment to WMH of its right to collect any Guarantee payments due to Rust under Article 24 of the EPC Agreement was a valid assignment.