M & A ASSOCIATES, INC., a/k/a M & A, Inc., Plaintiff,

v.

VCX, INC., Defendant.

No. 82–CV–4924–DT.

United States District Court,
E.D. Michigan, S.D.

April 8, 1987.

---

Simcha Shapiro, Spilkin & Shapiro, Southfield, Mich., for plaintiff.

Marietta S. Robinson, Sommers, Schwartz, Silver & Schwartz, Southfield, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

WOODS, District Judge.

M & A Associates, Inc. (M & A) agreed to sell VCX, Inc. (VCX) an exclusive right to make video cassette copies of a motion picture entitled "Debbie Does Dallas." M & A was to receive royalties of ten dollars for each copy sold by VCX. M & A claims that VCX breached its obligation to pay royalties. VCX, on the other hand, claims that its performance is excused because of M & A's failure to protect the film under the Copyright Act of 1976, 17 U.S.C. § 101, *et seq.*

The Court, having conducted a trial and having heard arguments by counsel, submits the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. M & A Associates, Inc., is an assumed name under which its president, Arthur Weisberg, conducts business in Michigan. Weisberg was a Michigan resident when the complaint was filed.

2. VCX, Inc., is a California corporation with its principal place of business in California. At all times pertinent to this action VCX manufactured video tapes for sale and/or distribution.

3. Norman Arno is the president of VCX.

4. "Debbie Does Dallas" was purportedly produced in 1978 by Schoolday Productions, Inc., a New York corporation.

5. The film was created through the cooperative efforts of David Buckley and other individuals. Buckley served as the writer, director, and producer. The other individuals were independent contractors of Schoolday.

6. Buckley, as the sole officer, director, and shareholder of Schoolday, exercised complete control over Schoolday and made all decisions concerning the film.

7. Although there was no contract by which the rights to the film were transferred from Schoolday to Buckley, the written minutes and records of Schoolday recited such a conveyance.

8. Buckley never copyrighted the film.

9. The film opened in October of 1978 at the Pussycat Theatre in New York City.

10. From that time until the present, the film continued to be theatrically shown without a copyright notice.

11. In December of 1978, Buckley conveyed all right, title, and interest in the film to M & A.

12. On or about February 13, 1979, M & A assigned to VCX the right to make video cassette copies of the film. The contract stated in pertinent part as follows:

> This agreement is for the sale of the exclusive video tape, video disc, and any other future, prerecorded video systems rights.
>
> M and A, Inc. . . . . hereby warrants that it is the sole owner of the motion picture, "Debbie Does Dallas" and is authorized to sell the exclusive video rights. Seller further warrants that it has not given said rights to any other entity, and will refrain, upon the completion of this agreement, from selling said rights or authorizing any other entity to distribute said video rights including M and A, Inc.
>
> . . . .
>
> The video rights given to [VCX] by [M & A] are exclusive for world wide distribution.
>
> [M & A] indemnifies [VCX] for any claims by others that [VCX] through this Agreement does not have the sole video rights to said motion picture, and agrees to pay the costs of any litigation, including attorney's fees, that arise from claims by others of ownership of this motion picture or ownership of the video rights of "Debbie Does Dallas."

13. The contract assigned only the video cassette rights in the film; M & A retained all theatrical rights in the film.

14. The contract is silent as to choice of law.

15. The contract became effective when signed by both parties in Michigan.

16. The contract does not specify the place of performance.

17. M & A's offices were located in Michigan, where VCX was to send its royalty payments and where M & A's performance presumably was to occur. VCX had an office in California. No acts by VCX relating to the manufacture, duplication, or sale of cassettes were expected to be performed in Michigan.

18. Arthur Weisberg knew that VCX entered into different types of contracts depending upon the type of rights VCX was acquiring, and that VCX and other companies would pay different amounts depending on whether they were obtaining exclusive or non-exclusive rights.

19. Weisberg testified that the matter of a copyright was neither mentioned nor considered by the parties prior to the time they entered into the contract. Arno testified, however, that he received a print of the film from Weisberg approximately one month after they entered into the contract. According to Arno, he asked Weisberg for "copyright protection" immediately after he received the print.

20. In April of 1979, Arno became aware of unauthorized copying of the film.

21. Arno, through VCX, retained attorneys John Lappen and Peter Berger for the purpose of bringing civil actions against "dupers" of his video cassettes. "Dupers" are individuals who, without authority from an owner, make duplicate copies of video cassettes.

22. Before VCX could commence litigation against dupers, VCX was required to make sure that reasonable efforts were taken to add copyright notices to all of the motion pictures and cassettes being published. VCX also had to file a copyright registration with the copyright office.

23. It was impossible for VCX to complete an application for a copyright registration without first obtaining information from Weisberg.

24. VCX could not protect the rights in the work "Debbie Does Dallas" by merely placing a copyright notice on the video cassettes. In order for there to be proper copyright notice, notice had to be added to both the video cassettes and the movie version shown in theatres.

25. In January of 1981, Berger informed Weisberg of the need to add copyright notice to the prints of the picture that had been sent to various theatres. Berger testified that copyright notice was needed to cure the fact that prints had been widely distributed without proper notice prior to that time.

26. The addition of a copyright notice to the prints of a picture is common in the movie industry and simple to accomplish.

27. Prints of a movie are distributed by making a negative, and then striking prints from that negative.

28. Motion picture prints of the picture are kept at print depots. When a booking is made, the print depot sends the print to the theatre.

29. Cineffects Color Laboratory, Inc., made the negative for "Debbie Does Dallas." Weisberg never asked Cineffects to insert a copyright notice on the movie.

30. Berger had several conversations with Weisberg in the months after their initial conversation in January of 1981. Berger repeatedly requested that Weisberg insert a copyright notice in the movie version of the picture. Weisberg refused to do so. To this day, the movie version of the picture does not contain a copyright notice.

31. In addition to communicating with Weisberg, Berger communicated with David Kravis, who worked for Weisberg. Berger advised Kravis that M & A needed a copyright notice inserted in the movie version of the film. Kravis also received the same advice from John Lappen. Despite receiving that advice, Kravis never inserted a copyright notice in the film.

32. At the time of the conversation between Berger and Weisberg in January of 1981, Weisberg and Arno both knew the legal significance of the omission of the copyright notice, and that such omission prevented Weisberg from having the ability to transfer exclusive video cassette rights to the film. The parties understood that such rights would be lost if reasonable efforts were not made to add the copyright notice to both the video cassettes and the movie version.

33. Weisberg also was told that if he continued to refuse to insert the copyright notice in the movie version of the film, M & A would be without any legal recourse against dupers.

34. In late 1981, Lappen and Berger determined that, under the Copyright Act, the copyright to the film was irretrievably lost since "reasonable efforts" had not been made.

35. Although VCX brought numerous civil actions against dupers of its video cassettes, the lack of a copyright notice in "Debbie Does Dallas" made it impossible for VCX to bring civil actions against dupers of that film.

36. VCX lost sales as a result of its inability to enforce its "exclusive" rights to sell video cassette copies of the film.

37. VCX nevertheless continues to the present time producing and selling copies of the film.

38. In exchange for the "exclusive" right to sell video cassette copies of the

film, VCX agreed to pay a $10.00 royalty for each video cassette copy sold, along with an advance payment of $25,000.00. A rider to the agreement permitted VCX to deduct $2,500.00 each month from the $25,-000.00 deposit and credit that amount to the first 10 monthly royalty payments.

39. VCX made royalty payments to M & A until March of 1982.

40. The payments totaled $235,440.00.

41. The market value of non-exclusive video cassette rights to the film is $10,-000.00.

42. The parties terminated the contract on November 19, 1982.

## CONCLUSIONS OF LAW

1. Both parties assume that the Court may assert jurisdiction over this case on the basis of diversity of citizenship. 28 U.S.C. § 1332(a). The allegations in "plaintiff" M & A's complaint and VCX's counterclaim, however, are jurisdictionally defective in that M & A is merely an assumed name and lacks capacity to bring or defend this action. F.R.Civ.P. 9(a). Nonetheless, the failure to name Arthur Weisberg as plaintiff and counter-defendant is at most a formal irregularity, which does not affect the diversity jurisdiction of this Court. *See Blanchard v. Terry & Wright, Inc.*, 331 F.2d 467 (6th Cir.), *cert. denied*, 379 U.S. 831, 85 S.Ct. 62, 13 L.Ed.2d 40 (1964). Moreover, neither party has been prejudiced by the failure to name Weisberg as plaintiff and counter-defendant. Under these circumstances, both parties may amend their pleadings to conform to the proofs and to this Court's findings of fact. F.R.Civ.P. 15(b); 28 U.S.C. § 1653; *Brandon v. Holt*, 469 U.S. 464, 470–71 & n. 19, 105 S.Ct. 873, 877–78 & n. 19, 83 L.Ed.2d 878 (1985). Furthermore, this Court may decide the legal issues prior to the filing of such an amendment. *Brandon*, 469 U.S. at 471, 105 S.Ct. at 877.

2. The Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, governs duplication rights in motion pictures.

3. Copyright generally vests in the author of the work. *Id.* § 201(a). Nevertheless, "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author ... and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." *Id.* § 201(b).

4. The Act defines a "work made for hire" as "a work prepared by an employee within the scope of his or her employment." *Id.* § 101.

5. In short, an employer owns the copyright to a work if (1) the work satisfies the requirements for copyrightability in 17 U.S.C. § 102(a); (2) the work was prepared by an employee; (3) the work was prepared within the scope of the employee's employment; and (4) the parties have not agreed otherwise in a signed, written instrument. *Baltimore Orioles v. Major League Baseball Players*, 805 F.2d 663, 667 (7th Cir. 1986).

6. At issue in this case is the second factor, namely, whether an employer-employee relationship existed between Schoolday and Buckley. An "employee," for purposes of the work made for hire doctrine, is any person who acts under an employer's direction and supervision. *See, e.g., Evans Newton, Inc. v. Chicago Systems Software*, 793 F.2d 889, 894 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 434, 93 L.Ed.2d 383 (1986); *Aldon Accessories v. Spiegel, Inc.*, 738 F.2d 548, 551–53 (2d Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984); *Murray v. Gelderman*, 566 F.2d 1307, 1309–10 (5th Cir.1978).

7. Buckley was not an employee of Schoolday. Buckley, not Schoolday, was the motivating force in producing the film. He exercised complete control of the corporation, which served as his mere alter ego. There simply was no supervision of his work other than his own. As a result, Buckley owned all rights to the film upon

its creation and could transfer those rights to M & A.[1]

8. The next issue involves the determination of what law governs the non-copyright questions in this case. Federal courts in diversity of citizenship cases must apply the choice of law rules for the state in which they sit. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In Michigan, the nature and effect of a contract is determined according to the law of the state where the contract was made. *E.g., Rubin v. Gallagher*, 294 Mich. 124, 128, 292 N.W. 584 (1940); *see also Wells v. 10–X Mfg. Co.*, 609 F.2d 248, 253 (6th Cir.1979); *Leff v. NAC Agency, Inc.*, 639 F.Supp. 1426, 1428 (E.D.Mich.1986).

9. The fact that the contract was made in Michigan, however, does not necessarily determine the choice of law. Michigan has adopted an additional rule that if the parties intended that a contract made in one state be performed in another state, then the law of the latter state governs performance. *See George Realty Co. v. Gulf Refining Co.*, 275 Mich. 442, 266 N.W. 411 (1936). In general, the state of performance refers to the state in which the party who allegedly breached the contract was required to perform. *Liberty Mutual Insurance Co. v. Vanderbush Sheet Metal Co.*, 512 F.Supp. 1159, 1167 (E.D.Mich.1981) (citing, e.g., *George Realty Co., supra*).

10. It is not clear how the performance rule should be applied to this case. Both parties allege a breach of the contract by the other party, which suggests that both Michigan and California could be the state of performance. California could also be considered the state of performance since each of the acts by VCX relating to the distribution, manufacture, duplication, or sale of video cassettes could only have been intended, at the time the contract was formed, to take place in California. Indeed, each of these acts by VCX took place in California. On the other hand, Weisberg claims that VCX breached its obligation to pay royalties. Under Michigan law, "[a]

contractual obligation to pay money is generally to be performed in the state where the creditor resides." *Liberty Mutual Insurance Co.*, 512 F.Supp. at 1168 (citing *Bastian Brothers Co. v. Brown*, 293 Mich. 242, 291 N.W. 644 (1940); *Douglass v. Paine*, 141 Mich. 485, 104 N.W. 624 (1905)). This suggests that Michigan should be considered the state of performance. Additionally, VCX alleges that Weisberg breached his obligations under the contract. If Weisberg's performance of the contract was contemplated to have occurred in any particular state, it certainly would have been in Michigan, the only state in which Weisberg conducted business under the assumed name M & A.

■ 11. "[W]here the place of performance is not focused in any particular state, courts have held that in the absence of evidence to the contrary, the parties intended that the law of the place where the contract was made should govern questions of validity." *Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp.*, 401 F.Supp. 1102, 1115 (E.D.Mich.1975). The *Structural Dynamics* court, noting the absence of Michigan authority on this point, relied on numerous decisions from other jurisdictions. *Id.* at 1115 & n. 9. This Court agrees that the performance rule does not determine choice of law when no state can be identified as the primary place of performance. Accordingly, the rights and obligations of the parties will be determined under Michigan law.

12. In this case the contract is silent as to copyright protection. The question is whether the contract can be interpreted as including the requirement that Weisberg obtain copyright protection for the film. When a contract is open to construction, a court must determine the true intent of the parties by looking to the language of the contract, its subject matter, and the circumstances surrounding its making. *E.g., Fischbach-Natkin Co. v. Power Process Piping, Inc.*, 157 Mich.App. 448, 452, 403 N.W.2d 569 (1987); *Damerau v. Rieckhoff*

---

**1.** Because Buckley owned the copyright in the film, there is no need to consider under § 201(b) the validity of Schoolday's purported transfer of the film to Buckley. *See* Finding of Fact ¶ 7.

*Co.,* 155 Mich.App. 307, 311–12, 399 N.W.2d 502 (1986); *Wilson v. Home Owners Insurance Co.,* 148 Mich.App. 485, 490, 384 N.W.2d 807, *leave to appeal denied,* 425 Mich. 876 (1986). The contract language should be given its ordinary and plain meaning, instead of a technical or strained construction. *Wilson,* 155 Mich.App. at 490, 384 N.W.2d 807. Moreover, a "contract should be interpreted to avoid an absurd or unreasonable result." *Miller v. Van Kampen,* 154 Mich.App. 165, 168, 397 N.W.2d 253 (1986).

13. The language of the contract suggests that Weisberg was required to obtain copyright protection for the film. The contract stated that Weisberg, through M & A, conveyed "exclusive" video rights to VCX. The following definition shows that the term "exclusive" implied that Weisberg would obtain copyright protection:

**Exclusive.** Appertaining to the subject alone, not including, admitting, or pertaining to any others. Sole. Shutting out; debarring from interference or participation; vested in one person alone.

*Black's Law Dictionary* 506 (5th ed. 1979).

14. The subject matter of the contract suggests that the parties intended that Weisberg obtain copyright protection for the film. As noted above, only Weisberg could have added a copyright notice to the movie version of the film. Until that notice was added, VCX was paying a $10.00 cassette royalty for a worthless "exclusive right" to duplicate the film on video cassette—something VCX or anyone else could have done freely without Weisberg's permission. All VCX received from the contract was a fresh print of the film and some assorted advertising material.

15. The circumstances surrounding the making of the contract similarly support the conclusion that Weisberg was required to obtain copyright protection for the film. Weisberg testified that the parties, at the time the contract was formed, never considered whether the film included a copyright notice. Arno, however, testified that as soon as he became aware of the absence of a copyright notice in the film, he immediately demanded that such notice be added. Thus, Arno apparently believed that the contract gave him the right to demand copyright protection so that he could enjoy the exclusive right to sell video cassette copies of the film.

16. Weisberg claims that the contract could be breached only if a third party claimed ownership of the film or the video rights. According to Weisberg, the term "exclusive" means that M & A would not grant such rights to any third parties. The difficulty with that argument is that Weisberg, by failing to insert copyright notice on the film, permitted and in effect granted third parties the right to sell video cassette copies of the film.

17. In short, Weisberg's agreement to provide VCX with the exclusive right to sell video cassette copies of the film "Debbie Does Dallas" included the obligation to add a copyright notice. Weisberg's failure to add such notice breached the warranty of title contained in that agreement. In so holding, this Court declines to impose an unreasonable condition on VCX, by requiring it to pay a $10.00 royalty for each video cassette sale, while any third party could freely sell such copies.

18. VCX seeks restitution for the money it paid to Weisberg. "The essential elements of such a claim are (1) receipt of a benefit by the defendant from the plaintiff and (2) which benefit it is inequitable that the defendant retain." *In re McCallum Estate,* 153 Mich.App. 328, 335, 395 N.W.2d 258 (1986) (citation omitted). The benefit must be conferred under circumstances such that restitution is necessary to protect the interests of the plaintiff. *Id.* It would be inequitable for Weisberg to retain royalty payments from VCX. VCX is entitled to restitution in the amount of $225,440.00, which represents the amount it paid to Weisberg in excess of the fair market value of what Weisberg furnished VCX.

19. Weisberg raises the defenses of laches, waiver, and estoppel. Each will be addressed *in seriatim.* "For one to successfully assert the defense of laches, it

must be shown that there was a passage of time combined with some prejudice to the party asserting the defense of laches.... Laches is concerned mainly with the question of the inequity of permitting a claim to be enforced and depends on whether the plaintiff has been wanting in due diligence." *In re Yeager Bridge Co.*, 150 Mich.App. 386, 398, 389 N.W.2d 99 (1986) (quoting *Rofe v. Robinson (On Second Remand)*, 126 Mich.App. 151, 154, 336 N.W.2d 778 (1983)); *see also Lothian v. City of Detroit*, 414 Mich. 160, 168–70, 324 N.W.2d 9 (1982).

20. VCX became aware of the copyright problem sometime after March of 1979. It delayed in filing suit until almost four years later. Nonetheless, VCX's awareness of the copyright problem is not the only factor in determining the applicability of laches. VCX had no duty to begin a legal action until it reasonably could conclude that one was necessary. In other words, VCX had no reason to bring an action until it could reasonably conclude that Weisberg's inaction, with regard to affixing the copyright notice upon the prints of the film in theatrical distribution, had destroyed the only chance of copyright protection for the film.

21. A copyright notice must consist of a specified form including (1) the symbol ©, the word Copyright, or the abbreviation Copr.; (2) the year of the first publication; and (3) the name of the copyright owner. The copyright notice must be "affixed to" the work. 17 U.S.C. § 401.

22. The offering of copies of a movie to a group of motion picture theatres for the purpose of public performance is a publication triggering the notice requirements of § 401. *See* H. Rept. No. 1476, 94th Cong., 2d Sess. 138, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5754 [hereinafter *House Report* ]; 1 M. Nimmer, *Nimmer on Copyright* § 4.11[A] [hereinafter *Nimmer* ].

23. Unless the omission of a copyright notice is excused, publication of a work without a proper notice of copyright affixed injects the work into the public domain. 17 U.S.C. § 405(a); 2 *Nimmer, supra*, § 7.14[A].

24. An omission of a copyright notice is excused if "registration for the work has been made before or is being made within five years after the publication without notice, and a reasonable effort is made to add notice to all copies or phonorecords that are distributed to the public in the United States after the omission has been discovered...." 17 U.S.C. § 405(a)(2).

25. Although Weisberg satisfied the registration requirement, he made no effort to add a copyright notice to the film. *See Shapiro & Son Bedspread Corp. v. Royal Mills Associates*, 764 F.2d 69, 73 (2d Cir.1985) ("It nevertheless seems clear that if *no* effort is made to add proper notice to copies distributed to the public after the defective notice is discovered, no cure is accomplished.").

26. If Weisberg had acted properly, he could have resurrected the film's copyright and thus conveyed exclusive rights to VCX. *See, e.g., Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 195 (2d Cir.1985) (registration "redounds to the benefit of the assignor as well as the assignee"). *Compare Hasbro Bradley, Inc., supra, O'Neill Developments, Inc. v. Galen Kilburn, Inc.*, 524 F.Supp. 710 (N.D.Ga.1981), *and House Report, supra*, at 147, *reprinted in* 1976 U.S.Code Cong. & Ad.News, at 5763 (even deliberate omissions are curable under § 405(a)(2)) *with Beacon Looms, Inc. v. S. Lichtenberg & Co.*, 552 F.Supp. 1305 (S.D.N.Y.1982) *and* 2 *Nimmer, supra*, § 7.13[B][3]) (only an unintentional omission of a copyright notice can be cured by compliance with the "reasonable effort" requirement and registration within five years).

27. Although Arno asked Weisberg for copyright protection of the film in early 1979, Weisberg first became aware of the legal significance of the omission of the copyright notice from the film in January of 1981. Weisberg thus received "notice" of the defect at that latter date. *See M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 443 & n. 21 (4th Cir. 1986). Weisberg's failure to take reason-

able efforts resulted in the film being irretrievably injected into the public domain "several months" later. *Gemveto Jewelry Co. v. Jeff Cooper Inc.*, 568 F.Supp. 319, 329–31 (S.D.N.Y.1983). *See generally Nimmer, supra,* § 7.13[B][2]. Thus, it was not until the middle of 1981 that VCX reasonably could conclude that the copyright was lost. VCX filed its counterclaim in early 1983, approximately a year and a half later.

■ 28. VCX's delay did not constitute a lack of diligence. Additionally, Weisberg has not shown that he suffered prejudice because of VCX's delay. As a result, VCX's right to restitution is not barred under the doctrine of laches.

■ 29. Waiver consists of a voluntary, intentional relinquishment of a known right. *Bissell v. L.W. Edison Co.*, 9 Mich. App. 276, 156 N.W.2d 623 (1967). A party to a contract may waive a claim for its breach by declarations, acts, and conduct inconsistent with a purpose of exacting strict performance. *Grand Rapids Asphalt Paving Co. v. City of Wyoming*, 29 Mich.App. 474, 185 N.W.2d 591 (1971). VCX did not waive Weisberg's breach of warranty of title. Instead, VCX continually requested Weisberg's performance until it concluded that the copyright was lost. Moreover, VCX's continued sale of video cassettes after ceasing royalty payments was not an intentional relinquishment of a known right. VCX freely distributed its video cassettes without the payment of royalties because Weisberg's actions had thrust the film irretrievably into the public domain.

■ 30. Weisberg finally contends that VCX is estopped from alleging that he breached warranties under the contract because VCX continued to accept benefits of the contract, and cites *Aiken v. Gonser*, 342 Mich. 29, 69 N.W.2d 180 (1955), to support that proposition. Estoppel does not apply to the present case because VCX never received benefits under the contract. VCX, by continuing to sell video cassette copies, merely exercised the right it shared with members of the public.

## ORDER

For the reasons set forth above, IT IS HEREBY ORDERED

1. That both parties be given fourteen (14) days from the date of this Opinion to amend their pleadings to name Arthur Weisberg as plaintiff and/or counter-defendant.

2. The claims of M & A Associates, Inc., and Arthur Weisberg against VCX, Inc., are dismissed.

3. Upon VCX, Inc.'s amendment of its counterclaim to name Arthur Weisberg as counter-defendant, judgment will be entered for VCX, Inc., in the amount of $225,-440.00.

So ordered.