MEMORANDUM[1]
I.
COHN, District Judge.
This case relates to enforcement of a non-competition agreement. Plaintiff, Superior Consultant Company, Inc. (SCC), sued its former employee, Michael F. Walling (Walling), seeking an injunction enforcing the non-competition, other gainful employment, and confidentiality provisions of the employment agreement between them. The action was originally brought in Oakland County Circuit Court, and removed here by Walling. Walling moved to dismiss for lack of personal jurisdiction or to transfer the case to the Northern District of Texas.[2] The Court, after denying Walling’s motion and granting a preliminary injunction from the bench on April 1,1994, ordered a continued hearing on April 5, 1994. At the hearing, the Court heard' from Walling and SCC’s president, Richard D. Helppie. On April 7, 1994, the Court issued an order granting SCC a permanent injunction in the form of Appendix A.[3]
II.
A.
SCC is a Michigan corporation with its principal place of business in Michigan and is engaged in the business of providing information systems and management consulting services to large, multi-facility healthcare institutions. SCC’s business is national and international in scope, involving employees in approximately thirty states and clients in forty-three states and Canada, Saudi Arabia, Singapore, France, and other nations. SCC competes with other national and international consulting companies, including Walling’s prospective employer, for clients and consultants and managers.
Walling is a resident of Texas who has worked in the health care information systems business, specializing in client consulting, since 1969. Before accepting employment with SCC, Walling had worked for Mother Frances Hospital (in Tyler, Texas), Medical Information, Inc., Coopers & Lyb-rand, and Peat Marwick Mitchell (now KPMG Peat Marwick). He worked at SCC from approximately June, 1990, until March, 1994.
On April 24, 1990, Walling executed in Michigan an employment agreement with SCC pursuant to which he was hired to work in SCC’s Dallas office in the position of Executive Director. In 1991 Walling received an increase in salary from SCC, and executed a new employment contract in Texas on August 2, 1991. Roughly five months later, on January 4, 1992, Walling executed another employment agreement in Texas (the 1992 Agreement). Later in 1992 Walling was promoted to Vice President, and the parties entered into an “Amendment to Employment Agreement” (the Amendment) to reflect Walling’s new position. The 1992 Agreement and the Amendment are at issue in this lawsuit.
The 1992 Agreement included the following relevant provisions:
Terms and Conditions of Employment: ... The employee further recognizes his/ *842 her obligations under applicable sections of this agreement, including, but not limited to, the sections governing non-competition, proprietary rights, and confidential information, will survive any termination of employment.
Other Gainful Employment: The employee shall devote full employment energies, abilities and time to the performance of services hereunder. The employee is prohibited from performing services similar to those offered by [SCC] on behalf of any other company, organization, individual or other legal entity. The employee is also prohibited from soliciting or negotiating to perform services similar to those offered by Superior on behalf of any other company, organization, individual or legal entity. Further, the employee must seek written approval of the company prior to engaging in any employment of any nature, similar to the company’s services or otherwise. Non-competition: In consideration of employment with [SCC], the employee is prohibited from soliciting business and/or performing services via direct employment or through a party other than [SCC] for a period of ninety (90) days from the date of any termination of employment with [SCC] for clients of [SCC] or prospective clients of [SCC] identified during the term ■ of employment. Employee accepts the obligation to inform [SCC] of prospective business opportunities.
For purposes of defining clients and prospective clients relative to non-competition, a “client” is any entity that [SCC] has provided services within the previous twenty-four (24) month period'from the date of the employee’s termination date, a “prospective client” is any entity that has been subject to [SCC] sales or marketing activity, other that mass mailings, within six (6) months prior to the employee’s termination date.
Further, the employee is prohibited from engaging in healthcare information systems consulting businesses for a period of six (6) months following date of termination, provided, however, this provision shall not be applied to restrain employee’s ability immediately upon termination of his employment by [SCC], to provide consulting services, in his individual capacity and not as an employee or independent contractor to another consultant company, to healthcare providers, other than [SCC’s] clients and prospective clients.
Confidential Information: The employee recognizes that in the course of performance of work for the company the employee will obtain access to materials and information of [SCC] that constitute trade secrets and proprietary information of [SCC], including- without limitation, descriptions of [SCC’s] products and services, planned products and services, business plans, employee compensation plans, the identities of suppliers, customers and prospective customers, identities of employees and prospective employees, prices and pricing policies. The employee shall not utilize any such information for any purpose other than the performance of this employment agreement and shall not disclose any such information to any third party. The employee shall, upon request by [SCC], return or destroy, as directed by [SCC], any media in which such information is recorded....
Dispute Resolution: Any and all disputes between the parties regarding this Agreement will be resolved pursuant to the following dispute resolution procedure, with the exception of breaches of the non-competition, confidential information or trade secret provisions of the Agreement for which [SCC] may seek injunctive relief from the courts at any time.
Choice of Law and Forum: This employment agreement will be governed by and interpreted in accordance with the laws of the State of Michigan.
The Amendment simply revises the 1992 Agreement to reflect Walling’s new duties as Vice President.
In early January, 1994, Walling was asked to sign another employment agreement with SCC. Walling notified SCC that he would not sign the new agreement. On February 25, 1994, Walling told SCC that he was terminating his employment, and left the company on March 4, 1994. On March 10, 1994, Walling agreed to accept a position with *843 Ernst & Young (E & Y) to provide health care information systems consulting services beginning on March 31, 1994.
In accepting employment with E & Y, Walling agreed not to disclose any confidential information acquired during his employment at SCC, and not to solicit or provide any services to clients of SCC with whom he had worked while at SCC. This agreement was memorialized in a letter from E & Y to Walling, which Walling signed. The letter reads:
This letter will confirm that we have advised you and you have agreed that any non-public information you have about the business and practices of [SCC], your former employer, learned while you were in its employ is to be kept confidential by you and not shared with anyone at [E & Y]. Similarly, under no circumstances are you to approach or attempt to provide any service to clients of [SCC] with which you had contact while employed by [SCC]. During the period of your non-compete agreement with [SCC], if any such entity or person approaches you seeking to retain you to provide services to them, you are to advise them that they should contact your former employer for those services.[4]
At the hearing on April 5, 1994, counsel for Walling informed the Court that E & Y considered SCC a third party beneficiary of the agreement embodied in the letter.
B.
In the course of his employment with SCC, Walling made approximately thirty-one trips to SCC’s corporate headquarters in Michigan. Attendees of the meetings discussed SCC’s business, addressed its plans, goals, and objectives, reviewed its performance, analyzed its results, and sometimes received training. Walling also negotiated the terms of his employment agreements in Michigan, as well as by mail and phone calls from Texas to Michigan. While working for SCC, Walling reported to SCC’s Michigan office hundreds of times, on an almost daily basis, by telefax, telephone, mail, voice mail, and email, and regularly sent expense reports, time, and billing reports to the Michigan office. Twice, SCC entertained clients in Michigan while Walling was present. Walling did not meet with or recruit clients while in Michigan, but did receive commissions for work done on behalf of a Michigan client, Huron Memorial Hospital. Walling is not a resident of Michigan, and does not own, use, or possess real or tangible personal property in Michigáh.
C.
This ease was filed on March 14, 1994 in Oakland County Circuit Court. On March 21, 1994, Walling and E & Y filed a declaratory judgment action in the 116th Judicial District Court of Dallas County, Texas, seeking an injunction restraining SCC from prosecuting this action (except to the extent necessary to defend jurisdictional or venue challenges by Walling), or from interfering or attempting to interfere with Walling’s prospective employment with E & Y. The Texas District Court denied Walling’s request for a restraining order. Also on March 21, 1994, Walling and E & Y removed this case to this Court.
SCC’s complaint contains three counts:
Count I: Breach of Contract—Non-competition Provision
Count II: Breach of Contract—-Other Gainful Employment Provision
Count III: Breach of Contract—Confidentiality Provision
III.
Walling moved for dismissal based on lack of personal jurisdiction, or, in the alternative, for transfer of venue to the Northern District of Texas, Dallas Division. Walling argued that his contacts with Michigan were not sufficient to support the assertion of either general or limited in personam jurisdiction over him by this Court, and that his contacts were further reduced in significance by the fiduciary shield doctrine. Walling also said that he never purposefully availed himself of *844 a Michigan forum, making assertion of jurisdiction by this Court inappropriate. In the alternative, Walling argued that the convenience of both parties and witnesses, and interests of justice weighed in favor of transferring venue to Texas.
A.
Michigan’s long-arm statute applicable to this action, MCLA § 600.70§, provides:
The existence of any of the following relationships between an individual or his agent and the state shall constitute a sufficient basis of jurisdiction to enable a court of record of this state to exercise limited personal jurisdiction over the individual and to enable the court to render personal judgments against the individual or his representatives arising out of an act which creates any of the following relationships:
(1) The transaction of any business within the state.
“The word ‘any’ means just what it says. It includes ‘each’ and ‘every.’ It comprehends ‘the slightest.’” Sifers v. Horen, 385 Mich. 195, 199, n. 2, 188 N.W.2d 623 (1971) (citations omitted). Michigan courts have interpreted the long-arm statute to be co-extensive with the scope of personal jurisdiction permitted by the due process clause of the United States Constitution.[5] Id. at 198, 188 N.W.2d 623.
In Burger King Corp. v. Rudzewicz, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), the Supreme Court found that a Florida District Court had personal jurisdiction over a Michigan franchisee whose only contacts with Florida were his franchise agreement with the Florida corporation and communications to Florida via telephone calls and letters. The Court was satisfied that Walling’s contacts with Michigan were more substantial than those of Rudzewicz with Florida in Burger King, and that it could therefore properly exercise jurisdiction over Walling under Michigan’s long-arm statute.
Walling negotiated the terms of his initial employment agreement with SCC in Michigan, and executed the agreement here.[6] As described above, he made numerous trips to Michigan while employed by SCC, attended at least two functions in Michigan at which clients of SCC were present, and was in nearly daily contact with the Michigan office via telephone, voice mail, telefax, mail, and email. Additionally, Walling performed work for a Michigan client on at least one occasion, and received a commission for that work. The sum of these activities easily meets the long-arm statute’s requirement of transacting “any business” in Michigan. Like the contractual relationship involved in Burger King, Walling’s relationship with SCC “envisioned continuing and wide-reaching contacts” with SCC in Michigan, contacts which increased as Walling was promoted. Burger King, 471 U.S. at 480, 105 S.Ct. at 2186. It is impossible in such circumstances to find that Walling’s contacts with Michigan were “random,” “fortuitous,” or “attenuated,” or that Walling did not intend to avail himself of the Michigan forum. Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). And as Burger King makes clear, a choice-of-law provision as is contained in Walling’s employment agreements should not “be ignored in considering whether a defendant has ‘purposefully invoked the benefits and protections of a State’s law”’ for jurisdictional purposes.” Burger King, 471 U.S. at 482, 105 S.Ct. at 2187.
Walling argued that all of his contacts with Michigan should be discounted because *845 they occurred while he was acting in a corporate rather than personal capacity. He said that the fiduciary shield doctrine “stands for the proposition that jurisdictional contacts made by an individual acting solely on behalf of an employer cannot constitute the basis of in personam jurisdiction.”
At the outset, the Court did not agree with Walling’s characterization of all of his contacts with Michigan as having taken place while he acted “solely on behalf of an employer.” At the very least, negotiations and execution of employment agreements cannot fairly be deemed activities undertaken on behalf of an employer. The negotiations and execution of the agreements, which contain Michigan choice of law clauses, may in themselves constitute sufficient contacts with Michigan to satisfy the requirements of due process.
In addition, it is not clear that the fiduciary shield doctrine should be applied to limit the reach of Michigan’s long-arm statute. The Court of Appeals for the Sixth Circuit has in dicta expressed unease with staking personal jurisdiction on “the activities of the corporate officers in behalf of the corporation,” Weller v. Cromwell, 504 F.2d 927, 931 (6th Cir.1974), and this Court in K Mart Corp. v. Knitjoy Manufacturing, Inc., 534 F.Supp. 153, 157-58 (E.D.Mich.1981) applied the reasoning behind the fiduciary shield doctrine to find that actions committed in an individual’s corporate capacity did not constitute acts sufficient to create due process under Michigan’s long-arm statute. However, the Supreme Court has since “rejeet[ed] the suggestion that employees who act in their official capacity are somehow shielded from suit in their individual capacity,” emphasizing that “[e]ach defendant’s contacts with the forum state must be assessed individually.” Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 781, n. 13, 104 S.Ct. 1473, 1481, n. 13, 79 L.Ed.2d 790 (1984) (citing Calder v. Jones, 465 U.S. 783, 790, 104 S.Ct. 1482, 1487, 79 L.Ed.2d 804 (1984)). Because Michigan courts have not explicitly limited the scope of Michigan’s long-arm statute by application of the fiduciary shield doctrine since Keeton, and because Walling also had significant contacts with Michigan in his personal capacity, the Court did not find that the fiduciary shield doctrine served to insulate Walling from the assertion of in personam jurisdiction in this forum, particularly since this is an action between Walling and his former employer as distinguished from a third party.
B.
Walling argued that if the Court did not dismiss this action for lack of personal jurisdiction, it should transfer the case to Texas under 28 U.S.C. § 1404(a). Twenty-eight U.S.C. § 1404(a) says:
For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where. it might have been brought.
The statute is broadly drafted, and leaves much to the discretion of the district court. Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3847. Here, SCC said that its representatives and all but one of its witnesses, as well as the documentary evidence involved in this case, were all in Michigan. Walling and his witnesses, he said, were in Texas. Neither party named its witnesses or identified its documents. In the Court’s view, transferring venue to Texas would simply have exchanged the inconvenience of one party for that of the other, despite Walling’s assertion that he would be more greatly inconvenienced by trial here than SCC would be by trial in Texas. As Walling’s myriad trips to Michigan during the course of his employment with SCC indicate, the inconvenience of his appearing in Michigan when necessary is de minimis. Under these circumstances, the balance of inconveniences did not so tilt in favor of Walling that SCC’s choice of forum should be disturbed.[7] See Catalano v. BRI, Inc., 724 F.Supp. 1580, 1583 (E.D.Mich.1989) (“Unless the balance of conveniences is strongly in favor of the defendants, plaintiffs’ *846 choice of forum should not be disturbed.” (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947))).
IV.
A.
SCC initially moved for a preliminary injunction restraining Walling (1) from engaging in any healthcare information systems consulting for a period of six months as an employee or independent contractor of or on behalf of any other entity; (2) from commencing or continuing his employment with E & Y or accepting employment with another employer in healthcare information systems consulting for a period of six months; (3) from competing, in any other way, as an employee or independent contractor of or on behalf of any other entity, with SCC in the field of healthcare information systems consulting for a period of six months; and (4) from using or disclosing any trade secret, confidential information, or proprietary information of SCC.
The Court issued the preliminary injunction on April 1, 1994, after considering the four factors the Sixth Circuit has identified as being of special importance in determining whether to issue a preliminary injunction:
(1) the likelihood of plaintiffs success on the merits; (2) whether the injunction will save the plaintiff from irreparable injury;
(3) whether the injunction would harm others; and (4) whether the public interest would be served by the injunction.
In re DeLorean Motor Co., 755 F.2d 1223, 1228 (6th Cir.1985) (citations omitted). The four factors are “to be balanced and are not prerequisites that must be satisfied.” In re Eagle-Picher Industries, Inc., 963 F.2d 855 (6th Cir.1992).
B.
1.
Before considering SCC’s likelihood of success on the merits at the hearing on April 1, 1994, the Court had to determine what law governed the enforceability of the relevant contractual provisions. The 1992 Agreement at issue contains a provision entitled “Choice of Law and Forum” which provides that the agreement will be governed by and interpreted according to Michigan law. Walling nevertheless argued that the Court should consider the agreement under Texas law, saying that Michigan law dictates applying the law of the state where any part of a noncompetition clause is to be enforced.[8]
Accepting Walling’s argument would have required the Court to interpret the Choice of Law' provision of the 1992 Agreement as specifying only the application of Michigan’s choice of law rules, as opposed to Michigan’s substantive law regarding noncompetition and related contractual provisions. Such an interpretation strikes the Court as obtuse at best. In crafting the contract’s Choice of Law provision, the parties agreed to apply a specific body of law rather than rely on the choice of law regime of the forum in which suit may later be brought. Otherwise the Choice of Law provision makes no sense. Because SCC operates in many states, merely specifying a state’s choice of law rules would be self-defeating, as it would not give SCC any certainty as to what substantive law would ultimately apply to any action under the contract.
The Choice of Law provision specifically provides that the employment agreement “will be governed by and interpreted in accordance with the laws of the State of Michigan.” As mentioned above, looking to Michigan’s choice of law rules would frustrate the clear meaning of the provision, that the agreement is to be interpreted under Michigan law. None of the authorities cited by Walling requires this counterintuitive result. See M & A Associates, Inc. v. VCX, Inc., 657 F.Supp. 454, 460 (E.D.Mich.1987) (holding that federal courts in diversity suits should apply the choice of law rules of the state in which they sit; the contract involved was “silent as to choice of law”); DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 678-81 (Tex.1990) (holding that under Texas law, Texas’s greater relationship to the parties and interest in the dispute dictated applying Texas law in contravention of parties’ choice of law clause; no mention is made of apply- *847 mg the choice of law rules of the state specified in the choice of law clause). The Court therefore found that Michigan law applies to the 1992 Agreement.
2.
It was undisputed that Walling violated his express agreement not to accept employment with any healthcare information systems consulting business for a period of six months following his termination. Under Michigan law, a noncompetition agreement is enforceable to the extent that it is “reasonable as to its duration, geographical area, and the type of employment or line of business.” MCLA § 445.774a(l).
The six month time period of the non-competition agreement here is reasonable. Longer periods have been approved, particularly where the non-competition agreement is designed in part to protect proprietary information learned by the employee. See Robert Half Intern., Inc. v. Van Steenis, 784 F.Supp. 1263, 1274 (E.D.Mich.1991) (finding a twelve month time period reasonable).
Geographic limitations in non-competition agreements must be tailored so that the scope of the agreement is no greater than is reasonably necessary to protect the employer’s legitimate business interests.[9] Here, the non-competition agreement did not specify any geographic limitations. Such an agreement can be reasonable if the employer actually has legitimate business interests throughout the world. See Sigma Chemical Co. v. Harris, 586 F.Supp. 704, 710 (E.D.Mo.1984) (finding worldwide application of restrictive covenant reasonable where the employer operated on a worldwide basis). SCC does business in forty-three states and a number of foreign nations. The unlimited geographic scope of the non-competition provision here was therefore not unreasonable.
The non-competition agreement here was also reasonable as to line of work, narrowly restricting its application to healthcare information systems consulting businesses. The agreement, though, did not restrict the type of work to which it applied. A limitation on working in any capacity for a competitor of a former employer is too broad to be enforceable. See Telxon Corp. v. Hoffman, 720 F.Supp. 657 (N.D.Ill.1989) (finding-unreasonable an agreement that would prevent defendant “from working as a competitor’s janitor.”) The Court therefore restricted the noncompetition agreement so that it applies only to actual consulting and management work for competitors of SCC, and only in the competitors’ healthcare information systems consulting businesses. So modified, the non-competition agreement is reasonable in scope.
C.
The next factor considered was whether SCC would suffer irreparable harm if Walling was not enjoined from working for a competitor. Walling argued that SCC did not allege that it sought protection for the confidentiality of any particular information system developed by SCC which Walling might reveal to E & Y, and that Walling was not an employee whom SCC trained only to lose him at the point at which he was about to become useful. SCC said Walling could not prevent his knowledge of SCC’s confidential methods from informing his work for a new employer in the field, and that Walling acquired detailed confidential information as to the specific needs and service provided to clients and specific clients of SCC.
Loss of customer goodwill and fair competition can support a finding of irreparable harm. Such losses often amount to irreparable injury because the resulting damages are difficult to calculate. Basicomputer Corp. v. Scott, 973 F.2d 507, 511-12 (6th Cir.1992). Here, as in Basicomputer, it was undisputed that Walling had access to confidential client information while he worked at SCC. Use of this knowledge would enable Walling effectively to solicit SCC’s clients, and to undercut SCC’s rates while providing the same services provided by SCC.
*848 Walling argued that there was no danger of Walling’s using confidential information to injure SCC’s competitive position because he signed a letter agreement with E & Y agreeing not to solicit clients of SCC or divulge confidential information. SCC could only sue E & Y under this contract, though, as a third party beneficiary. Because E & Y was not a party in this case, suing E & Y as a third party beneficiary would have required SCC to file a new case, not only entailing delay before any relief could have been obtained, but also requiring SCC to make out a violation of the contract in a plenary as opposed to a summary proceeding. Because E & Y is unlikely adequately to represent SCC’s interests, the letter agreement failed to protect SCC from the injury it fears. SCC would suffer irreparable injury if the non-competition agreement were not enforced.
D.
The third factor in determining whether to issue a preliminary injunction is “whether the injunction would harm others.” This factor is most commonly evaluated in terms of the balance of hardship between the parties. See Wright & Miller, Federal Practice and Procedure: Civil § 2948. Enforcing the noncompetition agreement imposed on Walling the significant hardship of not being able to work in his field of expertise, except through a business of his own, for a period of six months. Though serious, this harm is finite. If SCC suffered irreparable harm to its competitive position, the loss would be of incalculable quantity and duration. Also, the injunction sought by SCC only prevented Walling from violating his freely entered contractual obligations to SCC. While the hardship to Walling caused by issuing the preliminary injunction was not inconsiderable, the balance of hardships here tilted in favor of SCC.
E.
The final factor considered was whether the public interest would be served by the injunction. Walling correctly said that public policy disfavoring restraints on trade and interference with a person’s livelihood warrants strict examination of noncom-petition covenants. However, the Michigan legislature has explicitly endorsed such covenants where they are reasonable in scope. MCLA § 774a. The Court therefore did not find that an injunction enforcing the covenant here would be counter to the public interest simply because Walling, as he pointed out, was experienced before joining SCC, or because Walling agreed with E & Y not to solicit SCC clients or divulge confidential information. Because the non-competition agreement here, as modified by the Court, is reasonable as required by MCLA § 445.774a, the Court did not find its enforcement counter to public policy. Indeed had it found the non-competition agreement here unenforceable, the Court would have to find virtually all such agreements unenforceable, in contravention Michigan’s stated policy.[10] The public interests in protecting confidential information and in enforcing valid employment contracts weighed in favor of issuing the preliminary injunction.
All four factors favored issuance of a preliminary injunction enforcing the non-competition agreement as modified by the Court. Nevertheless, Walling argued that SCC has unclean hands in respect to its relationship with him, and therefore should not be allowed to avail itself of the extraordinary equitable remedy of a preliminary injunction. Walling said that SCC demonstrated bad faith in failing to pay him commissions it owes him, as well as for expenses he incurred as an employee. He also said SCC evidenced bad faith by pursuing this action in Michigan rather than in Texas, and by using the non-competition agreement to harass and intimidate other employees of SCC.
Because the Court found that personal jurisdiction and venue are appropriate here, SCC’s bringing this action here could not be taken as demonstrating bad faith. Walling’s statements in his affidavit concerning things said by SCC’s president regarding a previous lawsuit based on a non-competition agreement with another SCC employee are hearsay. And the affidavit’s assertion that SCC *849 insisted on enforcing the non-competition agreement in the case of another employee in order to pressure a client into paying SCC additional fees may not reflect an admirable style of conducting business, but was not evidence of bad faith by SCC here.
Walling’s assertion in an affidavit filed only days before the hearing on the preliminary injunction that SCC still owes him commissions and expenses was not sufficient to defeat the motion for preliminary injunction. If SCC owes Walling compensation from his employment there, he is entitled to pursue his legal remedies against SCC. Without knowledge of the circumstances surrounding the sums claimed by Walling, though, the Court did not find that SCC was precluded from obtaining equitable relief by virtue of having unclean hands.
V.
For the reasons stated, Walling’s motion to dismiss or to transfer was denied. No separate order was issued regarding Walling’s motion. SCC was entitled to the preliminary injunction issued on April 1, 1994, and was entitled to a permanent injunction because the evidence presented at the continued hearing on April 5, 1994, did not controvert any of the Court’s findings relative to the preliminary injunction.
APPENDIX A
UNITED STATES DISTRICT COURT EASTERN DISTRICT OF MICHIGAN SOUTHERN DIVISION
SUPERIOR CONSULTANT COMPANY, INC., a Michigan corporation, Plaintiff, vs. MICHAEL F. WALLING, Defendant.
Case No. 94-CV-71091

FINAL ORDER GRANTING PERMANENT INJUNCTION AND DENYING STAY PENDING APPEAL

At a session of said Court held in the United States District Court in the City of Detroit, County of Wayne, State of Michigan on Apr. 07, 199L

PRESENT: HONORABLE AVERN
COHN United States District Judge
THE COURT having conducted a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2), hereby orders as follows:
THE COURT HAVING FOUND THAT Plaintiff has legitimate business interests protected by the non-competition provision at issue and that the non-competition provision is reasonable in terms of duration, geographic limitation, and scope of activity covered as required by MCLA 445.774a; that Defendant has breached his employment agreement with Plaintiff such that Plaintiff has succeeded on the merits; that Plaintiff has and will continue to suffer irreparable harm as a result of Defendant’s breach; that Plaintiffs interests in protecting its business, confidential information, and trade secret protected information outweigh the harm caused Defendant by this injunctive relief; and that the public interest is served by enforcement of the non-competition provision;
IT IS HEREBY ORDERED:
(1) That Defendant, and—his agents and representatives, and eaoh^-of-them, and all corporations, unincorporated associations, partnerships, and-natural persons acting in concert with—Defendant and having- notice of this Order are restrained from doing, threatening, or attempting to do, or causing to be done, either directly or indirectly, by any means, method or device, any of the following acts:
(a) Engaging in any healthcare information systems consulting for a period of six months from March 4, 1994 as an employee or independent contractor of or on behalf of any other entity;
(b) Commencing or continuing employment with Ernst and Young or acting as a subcontractor to Ernst and Young in healthcare information systems consulting or accepting employment with another employer in healthcare information systems consulting for a period of six months from March 4, 1994;
(c) Competing, in any other way, as an employee or independent contractor *850 of or on behalf of any other entity (except an entity formed by Defendant of which he is and remains the sole employee or contractor and which entity does not itself act as a subcontractor to any other entity), with Superior in the field of healthcare information systems consulting for a period of six months from March 4, 1994;
(d) Communicating in any way with Ernst and Young’s healthcare consulting personnel or contractors on the subject of healthcare information systems consulting for a period of six months from March 4, 1994; or using or disclosing at any time any trade secret, confidential information, or proprietary information of Superior in any way or to anyone, including any persons at Ernst and Young;
(e) In addition to the foregoing, for a period of ninety days from March 4, 1994, Defendant shall not solicit business from or perform services for any client or prospective client of Superior identified during Defendant’s employment with Superior.
IT IS HEREBY FURTHER ORDERED that Defendant’s request for a stay of enforcement pending appeal is denied.
This Order is a Final Order for all purposes under the Federal Rules of Civil Procedure.

. This Memorandum memorializes the reasoning behind the preliminary injunction issued April 1, 1994, and the permanent injunction issued April 7, 1994, and supersedes the Court's bench opinion of April 5, 1994.

. After this case was filed in the Oakland County Circuit Court, Walling and his prospective employer brought suit in a state court in Texas seeking an injunction against further proceedings in this case. The Texas state court denied interim relief.

.Fed.R.Civ.P. 65(a)(2) provides for combining the hearing on the application for preliminary injunction with a trial on the merits. The parties agreed that the continued hearing on April 5, 1994, would constitute a trial on the merits and that the Court could proceed to a final decision on SCC’s claim without prejudice to any claims of Walling against SCC.

. While E & Y is a party to the Texas action, it is not a party to this action and has not sought to intervene as a party-defendant.

. However, The Michigan Supreme Court has said that "the Sifers court also declared that its holding rested upon ‘the exercise [of] jurisdiction to the extent indicated in the statute Witbeck v. Bill Cody’s Ranch Inn, 428 Mich. 659, 666, n. 3, 411 N.W.2d 439 (1987).

. Walling suggested that because the later employment agreements supersede the original one, and because those agreements were executed by Walling in Texas, "they have an insufficient nexus to this forum” to provide a basis for personal jurisdiction over Walling. Burger King, though, leaves no doubt that communications by mail or telephone, such as those involved in the execution of the later employment agreements, can constitute contact sufficient to confer personal jurisdiction, and that personal jurisdiction does not turn on "conceptualistic ... theories of the place of contracting or of performance." Burger King, 471 U.S. at 478, 105 S.Ct. at 2185 (quoting Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 316, 63 S.Ct. 602, 604, 87 L.Ed. 777 (1943)).

. Walling also argued that transfer to Texas would be in the interest of justice because Texas law governs the validity of the non-competition clause. As is discussed below, the Court found that the non-competition clause is governed by Michigan, not Texas, law.

. The Court expressed no opinion as to whether Michigan choice of law rules would, as Walling asserts, require application of Texas law in determining the validity of provisions of the 1992 Agreement.

. Walling argued that the non-competition agreement was designed not to protect any legitimate business interest, but only to restrain competition for talented employees among its competitors. Walling based this argument on the non-competition agreement's permitting Walling to work in the industry by starting his own firm. SCC said the agreement was aimed at preventing the disclosure of confidential information to competitors, who because of their size have the ability to use the information to destroy SCC's competitive position in the industry. Prevention of such anti-competitive use of confidential information is certainly a legitimate business interest.

. The policy in Texas appears to be the similar. See Tex Bus. <& Com.Code Ann. §§ 15.50-15.51; DeSantis, 793 S.W.2d at 683 ("In deciding whether an ancillary agreement not to compete is reasonable, the court should focus on the need to protect a legitimate interest of the promisee and the hardship of such protection on the prom-isor and the public.”)