*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

METAL STANDARD CORPORATION, a
Michigan corporation,

UNPUBLISHED
March 23, 2023

      Plaintiff/Counterdefendant-Appellant,

v

No. 359516
Kent Circuit Court
LC No. 18-007744-CB

CHEMICAL BANK, n/k/a HUNTINGTON BANK,
successor by merger to the Bank of Holland, a
Michigan banking corporation,

      Defendant/Counterplaintiff-Appellee.

Before:  K. F. KELLY, P.J., and BOONSTRA and REDFORD, JJ.

PER CURIAM.

Plaintiff/counterdefendant Metal Standard Corp. (plaintiff) appeals by right the verdict entered in favor of defendant/counterplaintiff Chemical Bank (defendant) after a bench trial, as well as the trial court's postjudgment order awarding defendant contractual attorney fees and costs. We affirm.

## I.  PERTINENT FACTS AND PROCEDURAL HISTORY

Plaintiff is a manufacturing business specializing in tube fabrication for the contract furniture industry.  Michael Wiersema has been the sole owner of plaintiff since 1980 and has served as its president, sole officer, and sole director since 2010.  Defendant is the successor by merger to the Bank of Holland.  On January 7, 2010, plaintiff established a $2 million line of credit with the Bank of Holland.  From January 21, 2015 through the end of 2017, defendant deposited into plaintiff's business checking account more than $1 million in advances from the line of credit.

In 2018, plaintiff discovered that its director of finance, Brian Scalabrino, had been embezzling from plaintiff since 2009 and that Scalabrino had been requesting the cash advances and using a portion of the funds to hide the embezzlement.  Subsequently, defendant demanded payment for the amounts owed under the line of credit.  Plaintiff refused the demand, as well as defendant's demand to view the collateral securing the loan.  Plaintiff subsequently filed suit, alleging that defendant had breached its contractual obligation by making unauthorized advances

-1-

on the line of credit. Specifically, and because only Wiersema was authorized to request cash advances, plaintiff alleged that if defendant had refused Scalabrino's requests or alerted Wiersema that Scalabrino was requesting advances from the line of credit, plaintiff would have discovered Scalabrino's embezzlement and avoided the harm that plaintiff had suffered. Defendant counterclaimed, among other things, for breach of the promissory note and for claim and delivery, on the basis that plaintiff had breached the parties' commercial security agreement by not repaying the cash advances.

The parties filed cross-motions for summary disposition under MCR 2.116(C)(10) (no genuine question of material fact, movant entitled to judgment as a matter of law). After a hearing on the motions, the trial court entered an order that, in relevant part, denied plaintiff's motion for summary disposition on its breach-of-contract claim, granted partial summary disposition in favor of defendant regarding plaintiff's liability for breach of the promissory note, and granted summary disposition in favor of defendant on defendant's counterclaim for claim and delivery. The matter proceeded to a bench trial to determine liability and damages on plaintiff's claim for breach of contract, and damages on defendant's counterclaim for breach of the promissory note.

At trial, three commercial loan officers who had handled plaintiff's account for defendant testified that Scalabrino was plaintiff's director of finance and its contact for finance and banking matters, and that it had been apparent that he was acting on plaintiff's behalf when he requested cash advances. Therefore, his requests did not raise any red flags.

Wiersema testified that Scalabrino was one of the members of a management team charged with the day-to-day operations of plaintiff in anticipation of Wiersema's eventual retirement. Scalabrino was responsible for managing plaintiff's finances, was authorized to sign corporate checks and manage the funds in plaintiff's corporate checking account, and was responsible for establishing relationships with banks and other financial institutions. However, Wiersema testified that Scalabrino was not authorized to request draws on plaintiff's line of credit with defendant. According to Wiersma, all of plaintiff's managers knew that only Wiersema could request cash advances on the line.

Elizabeth Lundquist, an employee in plaintiff's accounting department whose job was invoicing and opening mail, testified that she noticed in 2016 that Scalabrino's check remittance showed a negative tax deduction and that his net pay was greater than his gross pay; she did not immediately inform anyone of this discrepancy. Thinking that a negative tax deduction was suspicious, Lundquist printed Scalabrino's payroll reports in August 2016; her timing was affected in part by concerns that a planned conversion to new payroll software might make the reports harder to retrieve. Lundquist testified that she took the reports home and kept them for more than a year before mentioning them to Wiersema in December 2017, and giving the reports to him in January 2018.

Wiersema testified that when Lundquist gave him Scalabrino's payroll reports, he gave the information to his outside accountant, Jeffrey Disselkoen, who realized that Scalabrino and another employee, Suelynn Draper, were embezzling from plaintiff. On the first weekend in February, Wiersema went through Scalabrino's desk and found loan statements from defendant showing an outstanding line-of-credit balance of over $1 million. Scalabrino and Draper were fired on February 6, 2018.

Wiersema testified that he had expected defendant to follow the line-of-credit agreements and not authorize requests for draws made by anyone but him, and to contact him if someone else tried to draw on the line. Wiersema testified that because of defendant's failure to refuse Scalabrino's requests or contact him, Scalabrino was able to use the advances to hide the fact that he had falsified weekly reports to hide his embezzlement. Consequently, Wiersema did not have accurate information when making major financial decisions for plaintiff. Wiersema asked for $1.5 million in consequential damages resulting from his lack of accurate information, plus $260,000 for the stolen funds. On cross-examination, Wiersema conceded that he had testified at his deposition that all of the cash advances had been deposited into plaintiff's checking account and used to pay plaintiff's ordinary business expenses.[1]

Disselkoen also testified that if management had known the true state of plaintiff's cash position, it would have made different financial decisions. Disselkoen testified that most of plaintiff's losses were suffered in 2016 and 2017 and that, were it not for the 2015 line-of-credit draws, these losses never would have occurred. Plaintiff's damages expert, Robert Levine, determined that plaintiff had incurred $1,322,447 in excess costs during the period when it could not fully assess its financial condition. On cross-examination, Levine acknowledged that he was asked to assume that the draws on the line of credit were used to conceal embezzlement and that he was not asked to determine whether that was true or how much Scalabrino had stolen. He agreed that when the balance on the line of credit was zero (meaning that plaintiff had fully repaid any previous draws on the line of credit and had no outstanding obligation to defendant), the line of credit could not be used to conceal plaintiff's true financial picture. Levine also agreed that certain labor reductions undertaken by plaintiff in 2016 were unaffected by the previous cash advances requested by Scalabrino. The trial court also watched two witnesses' video depositions taken *de bene esse*: James Lilly, the bank officer who signed the business loan agreement, and Scalabrino.

After the trial concluded, the trial court issued a written opinion detailing its findings of fact, conclusions of law, and verdict. The trial court found that defendant, through its predecessor, had breached provisions in the business loan agreement and the promissory note when it allowed Scalabrino to take draws on the line of credit without Wiersema's authorization. However, the trial court rejected plaintiff's position that Scalabrino's draws on the line of credit had obscured plaintiff's financial position and, therefore, were the direct, natural, and proximate cause of more than $1.5 million in excessive labor costs and interest. The trial court concluded that defendant was entitled to the amount due on the promissory note, including interest and late fees. However, because defendant had breached the loan documents by allowing someone other than Wiersema to request draws, and the draws had helped Scalabrino hide his embezzlement scheme for a while by providing cash to serve as "backfill" for the money that he and Draper took, the trial court awarded plaintiff a $118,450 setoff against the amount due on the promissory note.

Subsequently, defendant moved the trial court for an award of $213,267.64 in attorney fees and costs on the basis of fee-shifting provisions in the business loan agreement and the promissory

---

[1] In plainer terms, Scalabrino did not steal the funds he requested as a cash advance from defendant; rather, he used those funds to replace the money he *did* steal, hiding the evidence of his theft.

note. After briefing and oral argument, the trial court issued a written opinion and order awarding defendant a net verdict of $1,116,492.61, augmented by attorney fees of $180,592.50 and court costs of $22,625.14. On defendant's motion, the trial court subsequently amended its opinion and order to reflect its prior grant of summary disposition on defendant's counterclaim for claim and delivery. This appeal followed.

## II. SUMMARY DISPOSITION

Plaintiff argues that the trial court erred by granting partial summary disposition in favor of defendant on its counterclaim for breach of the promissory note. We disagree.

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Zaher v Miotke*, 300 Mich App 132, 139; 832 NW2d 266 (2013). A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012). A trial court evaluating a motion for summary disposition under subrule (C)(10) "considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties . . . in the light most favorable to the nonmovant." *Maiden v Rozwood*, 461 Mich 109, 119-120; 597 NW2d 817 (1999). Summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). This Court's review is limited to the evidence presented to the trial court at the time the motion was decided. *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 475-476; 776 NW2d 398 (2009).

The basis of the trial court's decision to grant partial summary disposition in favor of defendant as to plaintiff's liability for breach of the promissory note was plaintiff's concession that at least some of the money transferred from the line of credit into its account was used for ordinary business expenses. Wiersma testified at his deposition that plaintiff had used the draws on the line of credit to fund ordinary business operations, and he acknowledged plaintiff's obligation to repay defendant the money plaintiff had received and spent to its benefit, subject to plaintiff's right to reduce the debt on the basis of damages caused by defendant's breach of contract. Similarly, at the summary disposition hearing, plaintiff's counsel agreed that all of the advances had been deposited into plaintiff's checking account with defendant, that the amount embezzled did not come anywhere close to the sum of the draws, and that plaintiff was willing to repay the advances that had been used for plaintiff's benefit, subject to defendant's proof of damages and plaintiff's right to set off its own damages.

Viewing the evidence in the light most favorable to plaintiff, see *Maiden*, 461 Mich at 119-120, it is clear that plaintiff, through Wiersema, acknowledged that the draws on the line of credit had been deposited into plaintiff's checking account and used to fund plaintiff's operations, and did not dispute that plaintiff was obligated, under the promissory note, to repay the draws used for its benefit. In short, plaintiff did not challenge its liability under the promissory note, but only asserted that it was entitled to a setoff based on its own alleged damages. See *Mahesh v Mills*, 237 Mich App 359, 361; 602 NW2d 618 (1999) (noting that a setoff is an equitable remedy that may satisfy a judgment); see also MCL 600.6008. Therefore, "[e]xcept as to the amount of damages, there [was] no genuine issue as to any material fact, and the moving party [was] entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). To the extent that plaintiff

argues on appeal that summary disposition should have been delayed until after plaintiff's claim had been litigated, MCR 2.116(I)(1) requires a trial court to render judgment without delay "if the affidavits or other proofs show that there is no genuine issue of material fact." In this case, Wiersema's deposition testimony and admissions showed that there was no genuine issue of material fact that plaintiff was liable for funds used in the ordinary course of its business. We conclude that the trial court did not err by granting partial summary disposition in favor of defendant on defendant's counterclaim for breach of the promissory note.

## III. DAMAGES

Plaintiff also argues that the trial court erred by not awarding plaintiff the damages it had requested from defendant's breach of contract, because defendant's breach was responsible for any uncertainty in calculating those damages. Again, we disagree.

This Court reviews for clear error a trial court's determination of damages after a bench trial. *Marshall Lasser, PC v George*, 252 Mich App 104, 110; 651 NW2d 158 (2002). "Clear error exists where, after a review of the record, the reviewing court is left with a firm and definite conviction that a mistake has been made." *Id*.

"The party asserting a breach of contract has the burden of proving its damages with reasonable certainty, and may recover only those damages that are the direct, natural, and proximate result of the breach." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). "The party asserting breach of contract has the burden to prove its damages with reasonable certainty." *In re Dissolution of F Yeager Bridge and Culvert Co*, 150 Mich App 386; 401; 389 NW2d 99 (1986). "[D]amages must not be conjectural or speculative in their nature, or dependent upon the chances of business or other contingencies . . . ." *Doe v Henry Ford Health Sys*, 308 Mich App 592, 602; 865 NW2d 915 (2014) (quotation marks and citation omitted). "Although breach-of-contract damages need not be precisely established, uncertainty as to the fact of the amount of damage caused by the breach of contract is fatal[.]" *Van Buren Charter Twp v Visteon Corp*, 319 Mich App 538, 551; 904 NW2d 192 (2017) (quotation marks and citation omitted; alteration in original).

In this case, Wiersema testified that the loss of a major client's business in 2016 and 2017 resulted in a 40% decrease in plaintiff's revenue, from $15 million to $9.7 million. Wiersma also testified that certain other problems, unrelated to plaintiff's cash position, had contributed to inefficiency and excess overtime for employees in 2016. Wiersema also testified that he did not make more extensive labor reductions in 2016 because he thought that plaintiff would be getting new projects. Record evidence also showed that Scalabrino made several requests for cash advances on the line of credit in early 2015, and that plaintiff repaid these advances by May 2015. No further advances were made until December 2016, and the balance remained at zero until that time. Levine testified that if the balance on the line of credit was zero, draws were not being used to conceal anything and that labor reductions in 2016 were unaffected by the line of credit because it was at zero. In sum, the record shows that the majority of the damages claimed by plaintiff accrued in 2016, when there were no cash advances hiding plaintiff's true condition. Plaintiff has not established that the trial court erred by determining that plaintiff failed to prove that defendant's unauthorized advances to Scalabrino in 2015, which were repaid by mid-2015, were the direct, natural, and proximate cause of plaintiff's failure to "right size" in 2016.

Plaintiff argues that defendant cannot benefit from the uncertainty caused by its own wrongdoing. But the case cited in support, *Story Parchment Co v Paterson Parchment Paper Co*, 282 US 555; 51 S Ct 248, 251; 75 L Ed 544 (1931), does not help plaintiff. In *Story Parchment*, the United States Supreme Court distinguished between damages that are not the certain result of a wrong, and damages that are definitely attributable to the wrong and uncertain only with respect to their amount. *Id*. at 562. The rule that precludes the recovery of uncertain damages applies to the former, not to the latter. *Id*. This rule applies in this case because plaintiff has not proved with reasonable certainty either the amount of damages attributable to defendant's breach of the loan documents, see *Van Buren Charter Twp*, 319 Mich App at 551, or that the claimed damages were the result of defendant's breach and not "dependent upon the chances of business or other contingencies," *Doe*, 308 Mich App at 602.

Plaintiff also argues that the trial court made two erroneous assumptions. First, plaintiff contends that the trial court erroneously assumed that plaintiff's decision-making from mid-2015 until late 2016—the period when the balance on the line of credit was zero—was not affected by the unauthorized advances in 2015. But, as stated, plaintiff's own damages expert testified that when the balance on the line of credit was zero, the cash advances did not impact plaintiff's decision-making. Despite plaintiff's assertion that the 2015 cash advances had "ripple effects" that affected its damages in 2016 and 2017, plaintiff has presented no evidence that contradicts its expert's testimony. Plaintiff also contends that the trial court erroneously assumed that the loss of a major client's business was the primary cause of plaintiff's financial strain between 2015 and 2018. The thrust of plaintiff's argument is that if defendant had not allowed Scalabrino to make unauthorized advances, plaintiff's true financial condition would have come to light, and Wiersema would have investigated why plaintiff was short on cash, discovered Scalabrino's embezzlement scheme, fired Scalabrino, and made different financial decisions, such as deeper labor cuts, in response to declining revenue. This hypothetical series of events is speculative. In addition, Scalabrino testified during his deposition that he typically requested advances when he knew that paying plaintiff's expenses, e.g., payroll, vendors, etc., would cause plaintiff's checking account to be overdrawn. The advances always went into plaintiff's checking account and were used to pay these expenses and to avoid overdrafts. It was only after plaintiff discovered Scalabrino's embezzlement that plaintiff discovered that some of the money Scalabrino used to pay the bills came from unreported, unauthorized cash advances that defendant expected plaintiff to repay. Wiersema's testimony and the documented decline in revenue resulting from the loss of a major client's business and plaintiff's struggles to replace it support the trial court's conclusion that loss of business put plaintiff under considerable financial stress unrelated to Scalabrino's embezzlement or his concealment of that embezzlement.

For these reasons, we conclude that the trial court did not clearly err by finding that plaintiff did not meet its burden to prove with reasonable certainty that the cash advances were the direct, natural, and proximate cause of the damages plaintiff sought. *Marshall Lasser, PC*, 252 Mich App at 110. Nor has plaintiff shown that the trial court erred by not holding defendant responsible for plaintiff's inability to prove its damages. *Id.*

## IV. SETOFF

Plaintiff also argues that the trial court erred by limiting plaintiff's setoff to the amount embezzled by Scalabrino from 2015 until August 30, 2016. Plaintiff has not established that it is entitled to relief on this issue.

This Court reviews de novo a trial court's decision whether to grant equitable relief. *In re Conservatorship of Murry*, *336 Mich App 234*, 261; 970 NW2d 372 (2021). We review a trial court's factual findings supporting its decision for clear error. *Dep't of Environmental Quality v Gomez*, 318 Mich App 1, 31; 896 NW2d 39 (2016).

Under Michigan law, setoff is an affirmative defense that "refers to a defendant's right, in the same action, to cut down the plaintiff's demand, either because the plaintiff has not complied with some cross obligation of the contract on which [it] sues or because the plaintiff violated some legal duty in making or performance of the contract." *McCoig Materials, LLC v Galui Const Inc*, 295 Mich App 684, 695; 818 NW2d 410 (2012) (quotation marks and citation omitted).

The trial court found that defendant breached the loan documents by making unauthorized advances. Although the trial court viewed Scalabrino's embezzlement scheme as unrelated to the draws, the court acknowledged that the draws helped Scalabrino hide his scheme for a while by serving as "backfill" for the money that he and Draper took. Having found that defendant did not comply with its contractual obligation to limit the authorization of advances to Wiersema, and that some of the money helped Scalabrino hide his embezzlement, the trial court determined that defendant's counterclaim for payment on the promissory note should be reduced by some of the amount embezzled. *Id.* The trial court reasoned that August 30, 2018 was an equitable cutoff date for determining the amount of the setoff because that was the date when Lundquist, troubled by an anomaly in Scalabrino's pay remittances that she had discovered earlier, took it upon herself to print Scalabrino's payroll reports and take them home. The payroll report clearly showed that the federal tax withholding amount on Scalabrino's paychecks was a negative number and that his net earnings was always greater than his gross pay. Because it did not require any specialized knowledge to understand that Scalabrino was receiving more money each pay period than he should have, the trial court concluded that, from August 30, 2016 forward, plaintiff had ample evidence to detect Scalabrino's embezzlement scheme and that plaintiff could not provide an equitable reason to demand setoff after that date.

We conclude that the trial court did not err by limiting plaintiff's equitable setoff against the amount due on the promissory note to the amount embezzled before August 30, 2016. We disagree with the characterization that the trial court imputed Lundquist's knowledge of the anomalies in Scalabrino's pay remittances to plaintiff. Rather, the trial court determined that it was more equitable for plaintiff to bear the consequences of its employee's decision to delay coming forward with information that she knew showed serious anomalies in Scalabrino's pay remittance. The record shows that Lundquist was aware of obvious anomalies in Scalabrino's pay, that Lundquist believed it important to preserve Scalabrino's payroll reports, and that she printed the reports on her own initiative before changes in the accounting software could make the records more difficult for her to retrieve. However, Lundquist informed no one else of this anomaly, and kept the records to herself more than a year, before finally turning them over to Wiersema. Given the record before us, the trial court did not clearly err by determining that Lundquist was aware of

a substantial anomaly in Scalabrino's pay by August 30, 2016. *Gomez*, 318 Mich App at 31. The trial court also did not err by making the equitable decision to assign to plaintiff the consequences of Lundquist's failure to come forward with the information she possessed. *Conservatorship of Murry*, 336 Mich App at 261.

## IV. CONTRACTUAL ATTORNEY FEES

Lastly, plaintiff argues that it was defendant's breach of the loan documents that created plaintiff's liability under the promissory note, and that the trial court therefore erred by awarding defendant contractual attorney fees and costs. We disagree.

This Court reviews for an abuse of discretion a trial court's decision to award attorney fees and its determination of the reasonableness of the fees. *Patrick v Shaw*, 275 Mich App 201, 204; 739 NW2d 365 (2007). "The abuse of discretion standard applies where there is not a single correct outcome, so the trial court should be affirmed as long as the outcome is reasonable and principled." *Id*. The interpretation of a contract is a question of law that this Court reviews de novo. *Id*. The fundamental goal of contractual interpretation is to "honor the intent of the parties." *Id*.

"As a general rule, attorney fees are not recoverable as an element of costs or damages absent an express legal exception." *Fleet Business Credit LLC v Krapohl Ford Lincoln Mercury Co*, 274 Mich App 584, 589; 735 NW2d 644 (2007). "Attorney fees may be recovered if expressly provided for by contract." *Highfield Beach at Lake Mich v Sanderson*, 331 Mich App 636, 670; 954 NW2d 231 (2020). In this case, the parties' business loan agreement contains a fee-shifting provision, which states in relevant part:

> **Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit . . . . Borrower shall also pay all court costs and such additional fees as may be directed by the court.

The parties' promissory note contains a similar provision, which states in pertinent part:

> **Attorneys' Fees; Expenses**. Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and expenses . . . . If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

Plaintiff argues that, but for defendant's unauthorized advances, there would have been no balance due on the line of credit and no reason to hire anyone to help collect on the note. However, it is undisputed that the advances from the line of credit were deposited into plaintiff's corporate

checking account and that plaintiff refused to pay the balance due on the line of credit, making it necessary for defendant to take legal action to collect on the promissory note. Under the plain language of the parties' contract, defendant was entitled to recover from plaintiff the reasonable attorney fees and legal expenses incurred to collect on the note.[2] *Patrick*, 275 Mich App at 204.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Mark T. Boonstra
/s/ James Robert Redford

---

[2] Apart from implying that defendant was not entitled to any attorney fees and costs, plaintiff has not argued that the trial court's attorney-fee analysis was flawed or that the amount of attorney fees and costs awarded to defendant was unreasonable.